**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CORY LEDEAL KING,
*Defendant-Appellant.*

No. 09-30442

D.C. No.
4:08-cr-00002-
BLW-1

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
November 3, 2010—Portland, Oregon

Filed October 3, 2011

Before: Ruggero J. Aldisert,* William A. Fletcher and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge William A. Fletcher

---

*Honorable Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

18637

## COUNSEL

Syrena Case Hargrove, OFFICE OF THE UNITED STATES ATTORNEY, Boise, Idaho, Robert Parke Stockman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the appellee.

David R. Lombardi, GIVENS PURSLEY LLP, Boise, Idaho, Kathleen M. Sullivan, QUINN EMANUEL URQUHART & SULLIVAN LLP, New York, New York, Paul L. Westberg, WESTBERG, McCABE & COLLINS, Boise, Idaho, for the appellant.

Daniel J. Popeo, Richard A. Samp, Michael Rybak, Washington Legal Foundation, Washington, D.C., Amicus.

## OPINION

W. FLETCHER, Circuit Judge:

Defendant-Appellant Cory King was convicted after a three-day jury trial of four counts of injecting fluids into deep wells without a permit, in violation of the Safe Drinking Water Act, 42 U.S.C. § 300h-2(b)(2). He was also convicted of one count of making a "materially false" statement in a "matter within the jurisdiction" of the United States, in violation of 18 U.S.C. § 1001(a)(2). King timely appealed. We affirm.

### I.   Background

At all times relevant to this appeal, King was the manager of a large farming and cattle operation in southern Idaho, Double C Farms Partnership ("Double C"). Double C's facilities include about 11,500 acres of cropland irrigated by a system of wells and pivots (a type of agricultural sprinkler), and a segregated 25-acre cattle feedlot containing between 15,000 and 20,000 head of cattle.

In January 1987, King applied to the Idaho Department of Water Resources for a permit to inject "winter runoff from Willow Creek," a creek that passes through the Double C facilities, into a 500-foot well between November and April.

The purpose was "to inject this water in winter so that it can be pumped out in summer." The application stated that because the injected water would be used to irrigate crops, it "must be clean." The State denied the application in November 2000.

On May 23, 2005, John Klimes, an investigator employed by the Idaho Department of Agriculture, drove onto Double C property to conduct a "routine waste inspection" of the feedlot operation. Klimes had an 11:00 a.m. appointment with feedlot manager Curtis Taylor. As Klimes drove toward the feedlot for the appointment, he noticed that the north side of the "main waste pond" for the feedlot had washed out and that waste was running from the pond into a ditch. He also noticed that a pipe on the west side of the pond "had been uncapped" and that waste from the pipe was running into the same ditch. When Klimes arrived at the feedlot, Taylor was not there. Klimes called him on his cell phone, and they arranged to meet at about 2:00 p.m. that afternoon.

As Klimes was driving away from the feedlot, he was stopped by a man in a pickup truck coming the opposite direction. The driver identified himself as "one of the main irrigators on the Double C facility," but declined to give his name. The employee was later identified as Shaun Carson. Klimes identified himself as an inspector from the Department of Agriculture. Carson told Klimes that the water in the ditch came from a waste containment pond that had ruptured. He also told Klimes that anti-backflow valves at two wells on the property had been reversed so that the "dirty water" could be injected into the wells. Carson urged Klimes to investigate quickly because the valves would be installed properly by the end of the day.

Klimes investigated the valves at Wells One and Four on the Double C property. Just as Carson had said, the backflow valves at each well were installed in the wrong direction, allowing water to flow into the wells. Klimes saw no irriga-

tion pivots operating in the vicinity of either well. If pivots had been operating, that would have indicated that water was coming out of, rather than going into, the wells. Klimes also heard water "cascading" into Well One. When Klimes returned to the wells later in the day, the valves were properly installed, as Carson had said they would be.

On June 2, Klimes returned to Double C for a scheduled meeting with King. He was accompanied by his supervisor, John Chatburn, as well as other Idaho Department of Agriculture employees. At the meeting, Chatburn confronted King with the allegation that he had been injecting wastewater into his wells. King denied the allegation. When Chatburn asked King if they could take samples from his wells, King responded that the wells had not yet been turned on. This contradicted what Klimes had observed on his first visit to Double C.

Later that day, Klimes and Chatburn went to Well Five unaccompanied by King. They noticed an uncovered valve that was ordinarily covered with dirt. They heard water "running back down the well." The ground around the well was vibrating slightly, and the vent pipe at the back of the well was blowing air. Later that day, as Klimes was driving around the Double C facilities, he noticed King and Jose Guerrero near Well Five from about half a mile away. Klimes approached them and asked King and Guerrero to accompany him to the well. When they arrived at Well Five, Klimes saw that the valve had been re-covered. Klimes asked King what the valve did. King told Klimes that the valve led to a nearby irrigation pivot. It was established at trial that King's statement to Klimes was false. The valve, in fact, led to the well.

In February 2008, the government filed a First Superseding Indictment charging King with four counts of violating the Safe Drinking Water Act ("SDWA"). Each count alleged that King "willfully injected water" into a well "which is more than eighteen feet in vertical depth below land surface, with-

out a permit issued by the State of Idaho, despite having knowledge of the requirement to first obtain such a permit[.]" None of the four counts charged that the injected water was contaminated. The indictment also charged King with one count of violating 18 U.S.C. § 1001(a)(2) by "knowingly and willfully" making a "materially false" statement in a "matter within the jurisdiction" of the United States when he told Klimes that "the valve and pipe. . . at . . . Well No. 5 [were] feeding an irrigation pivot."

The jury returned a guilty verdict on all five counts. King appeals on several grounds. With respect to the four counts under the SDWA, King makes two statutory arguments. First, he contends that the government was required to allege and prove that the injected water had an adverse effect on an underground source of drinking water. Second, he contends that Idaho's permitting requirement for injection wells is not part of Idaho's "applicable underground injection program," so that his failure to obtain a permit did not violate the SDWA. He also makes a constitutional argument. He contends that if his unpermitted injections are held to violate the SDWA, the Act exceeds Congress' authority under the Commerce Clause. With respect to the fifth count under 18 U.S.C. § 1001(a)(2), King contends that his "materially false" statement was not made in a "matter within the jurisdiction" of the United States because it was made to a state agricultural inspector. Finally, King challenges the district court's denial of his post-verdict motion for a new trial because of violations of a pre-trial order and alleged prosecutorial misconduct.

We discuss King's arguments in turn.

## II.   Standard of Review

We review *de novo* the sufficiency of an indictment. *United States v. Oren*, 893 F.2d 1057, 1063 (9th Cir. 1990). We review the district court's construction of the SDWA *de novo*. *See United States v. Cabaccang*, 332 F.3d 622, 624-5 (9th

Cir. 2003) (en banc). We review the district court's construction of 18 U.S.C. § 1001 *de novo*. *Oren*, 893 F.2d at 1064. We review Congress' authority under the Commerce Clause *de novo*. *United States v. Dorsey*, 418 F.3d 1038, 1045 (9th Cir. 2005). Finally, we review a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004); *United States v. Allen*, 341 F.3d 870, 891 (9th Cir. 2003).

### III.   Counts One Through Four: Safe Drinking Water Act

**[1]** Under Counts One through Four, King was convicted under 42 U.S.C. § 300h-2(b)(2), which criminalizes "willful" violations of an "applicable underground injection program." "Underground Injection Control Programs" are state-administered programs under the federal Safe Drinking Water Act that prevent harmful injections into drinking water aquifers. The counts were based on four discharges of water into deep wells without a permit from the State of Idaho.

### A.   Statutory Arguments

#### 1.   Proof of Connection to an Underground Source of Drinking Water

King contends that the government failed to allege and prove violations of § 300h-2(b)(2). King concedes that the government alleged and proved that he willfully injected water into wells despite not having a permit from the State of Idaho under its Underground Injection Control ("UIC") program. But King contends that in order to establish a violation of an "applicable underground injection program" under § 300h-2(b), the government must also allege and prove that his injection of water "implicated" or "pertain[ed] to" an underground source of drinking water ("USDW").

**[2]** King misunderstands the allocation of the burden of proof under the SDWA. King had the burden to show, during

Idaho's permitting process, that his proposed injection would not adversely affect an USDW. To prove a violation of § 300h-2(b)(2), the government does not need to show that an injection will have such an effect on an USDW. The government need only show the absence of a permit under Idaho's UIC program.

The SDWA establishes a federally mandated, state-administered regulatory scheme for the protection of drinking water. It provides that an applicant for a permit to inject fluids has the burden of showing that the injection will not endanger underground sources of drinking water: "[T]he applicant for the permit to inject must satisfy the State that the underground injection will not endanger drinking water sources." 42 U.S.C. § 300h(b)(1)(B)(i). "Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or reasonably can be expected to supply any public water system of any contaminant . . . ." *Id.* at § 300h(d)(2).

The SDWA's implementing regulations specify that "[t]he applicant for a permit shall have the burden of showing" that the applicant's "injection activity" will not "allow[ ] the movement of fluid containing any contaminant into underground sources of drinking water." 40 C.F.R. § 144.12(a). "Any underground injection, except . . . as authorized by permit issued under the UIC program, is prohibited." *Id.* at § 144.11. "[N]o injection shall be authorized by permit . . . if it results in the movement of fluid containing any contaminant into [an USDW] if the presence of that contaminant may cause a violation of any primary drinking water violation . . . ." *Id.* at § 144.1(g)

**[3]** The SDWA and its implementing regulations are not concerned with whether an injected fluid is itself contaminated. Rather, they are concerned with the result of "injection activity." A permit applicant must show that the proposed activity will not allow "the movement of fluid containing [a]

contaminant." *Id*. Injections of clean water into the ground can cause the movement of contaminants into an aquifer. For example, contaminants may dissolve into clean water as the injected water passes through the soil on its way to an aquifer. Or, if water is injected under pressure it may cause fractures in subsurface structures, thereby releasing contaminants into the aquifer. *See* Subsurface Emplacement of Fluids, 39 Fed. Reg. 12922, 12922-23 (April 2, 1974). Therefore, a permit applicant must show, even as to a proposed injection of clean water, that the injection will not allow "the movement of fluid containing [a] contaminant." *Id.*

Idaho administers and is the primary enforcer of the SDWA under an UIC program approved by the federal Environmental Protection Agency ("EPA"). *See* 40 C.F.R. § 147.650. Under Idaho's UIC program, injections of fluids into deep wells require a permit. Idaho defines a "drinking water source" as an "aquifer which contains water having less than the 10,000 mg/l total dissolved solids," and has not otherwise been exempted by the State's director of the department of water resources. Idaho Code § 42-3902(3); Idaho Admin. Code § 37.03.03, Rule 10.17 (same); *see* 40 C.F.R. § 144.3 (including this definition). A "waste disposal and injection well" is "an injection well which is more than eighteen (18) feet in vertical depth below land surface." Idaho Code § 42-3902(19). No existing "waste disposal and injection well" can be used "unless a permit therefor has been issued" by the state director of the department of water resources." *Id.* § 42-3903. The director may issue a permit only if non-contamination conditions for the permit have been "met" by the applicant, including whether "drinking water sources" will be "unreasonably affected." Idaho Admin. Code, § 37.03.03, Rule 45.02; *see also Id.* at Rule 50.

**[4]** We therefore conclude that the government was not required to prove, as an element of the crime of violating § 300h-2(b)(2), that King's injection of water would have an adverse impact on an USDW. The government was required

to prove only that King "willfull[y]" failed to comply with a "requirement of an applicable underground injection program." Accordingly, the government was required to prove only that King willfully injected water into a well more than eighteen feet deep without a permit, knowing that a permit was required under Idaho law.

## 2.   Idaho's Permit Requirement as a Part of the SDWA

**[5]** King further contends that he cannot be convicted under federal law for violating Idaho's permitting system because it is not part of "an applicable underground injection program" within the meaning of § 300h-2(b)(2). In King's view, the Idaho UIC program has a greater scope than the SDWA. He points to 40 C.F.R. § 145.1(g)(2), which provides, "Where an approved State program has a greater scope of coverage than required by Federal law the additional coverage is not part of the federally approved program." King contends that the requirements for obtaining a permit under Idaho law encompass more than just the absence of adverse effects on an USDW, and that the Idaho permitting program is therefore not entirely within the scope of the SDWA. We disagree.

**[6]** When the federal government approved Idaho's UIC program, it specifically incorporated Idaho's entire permitting process into the SDWA:

> *Incorporation by reference.* The requirements set forth in the State statutes and regulations cited in this paragraph are hereby incorporated by reference and made a part of the applicable UIC program under the SDWA for the State of Idaho. . . .
>
> . . .
>
> (7) Waste Disposal and Injection Wells, Title 42, Chapter 39, Idaho Code, sections 42-3901 through

> 42-3914 (Bobbs-Merrill 1977), sections 42-3915
> through 42-3919 (Supp. 1984).

40 C.F.R. § 147.650(a). The reference in § 147.650(a)(7) to specific provisions of Idaho law, including those applicable to permitting, make clear that the entire Idaho permitting process was approved and incorporated into the SDWA.

## B.    Commerce Clause

King contends that if the SDWA is construed to allow a criminal conviction in his case, Congress has exceeded its authority under the Commerce Clause. We disagree.

[7] Congress passed the SDWA in 1974 in response to its concern that underground sources of drinking water were threatened by unregulated underground injections. H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454-6506. The House Report noted that recently enacted environmental laws, such as the Clean Air Act and the Clean Water Act, had increased the cost of atmospheric and surface waste methods of disposal, such as burning and dumping. *Id.* at 6459. The gap left by these laws resulted in the increased use of underground injections to dispose of waste. *Id.* The Report also found that existing federal and state laws regulating sources of drinking water were inadequate to ensure the safety of drinking water. *Id.* at 6456-60. The Report cited a 1968 study that found that 79% of water systems were not inspected by county or state authorities. *Id.* at 6458. The Report also cited an EPA study that found that 19% of water systems did not meet the bacteriological limits of then-current drinking water standards. *Id.* The Report further cited a 1973 Government Accountability Office study that found that of 446 water systems studied, only 60 were in compliance with then-current federal bacteriological and sampling requirements. *Id.* at 6458-59. Between 1961 and 1970, there were 130 outbreaks of disease or poisoning attributable to drinking

water sources, causing over 46,000 illnesses and 20 deaths. *Id.* at 6457.

The House Report recognized that an effective regulatory scheme protecting drinking water would need to be national in scope:

> In general, water in the hydrologic cycle does not respect State borders. The Nation also has an important fiscal interest in minimizing drinking water related disease, since such disease may well contribute significantly to the drain on the Federal health care financing system — Medicare, Medicaid, etc. — unless the quality of the Nation's drinking water supplies is protected.

*Id.* at 6461. Congress ultimately concluded that a cooperative federal-state program would be an appropriate means of ensuring drinking water safety.

The SDWA has two parts. The first part, known as the National Primary Drinking Water Regulations, 42 U.S.C. § 300g, sets national minimum standards for drinking water quality. That part is not at issue in this appeal. The second part, 42 U.S.C. § 300h, regulates underground injections that might adversely affect current and potential underground sources of drinking water. King was prosecuted under the second part.

Under the second part of the SDWA, a state may apply to administer an UIC program in lieu of being subject to federal regulations. 42 U.S.C. § 300h-1; 40 C.F.R. §§ 145 *et seq*. If its program is approved, a state may regulate underground injections through one of two means: rulemaking or permitting. 42 U.S.C. § 300h(b)(1)(A). If a state opts to regulate underground injections through permitting, the SDWA requires the state to "prohibit . . . *any* underground injection . . . which is not authorized by a permit issued by the State[.]"

*Id.* (emphasis added). *See also* 40 C.F.R. § 144.1(g) ("The UIC Permit Program regulates underground injections by six classes of wells . . . . All owners or operators of these injection wells must be authorized either by permit or rule by the Director."); *Id.* at § 144.11 ("[a]ny underground injection, except into a well authorized by rule or except as authorized by permit issued under the UIC program, is prohibited").

The injection provisions of the SDWA are "preventive." 1974 U.S.C.C.A.N. at 6463. Congress concluded that the most effective way to ensure clean drinking water was to prevent pollution of underground aquifers in the first place, rather than to clean up polluted aquifers after the fact. Under the SDWA, the danger posed by proposed injections to an underground aquifer is determined during the permitting process. As noted above, the SDWA puts the burden on a permit applicant to show that a proposed injection will not endanger an USDW. If an applicant fails to show that a proposed injection is safe, the SDWA requires that the permit be denied. That is, in the absence of a showing by the applicant that a proposed injection is safe, the SDWA presumes that the injection will endanger an USDW.

The constitutional question before us is whether this federal regulatory scheme exceeds Congress' power under the Commerce Clause.

**[8]** Congress may regulate the channels of interstate commerce; may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce; and may regulate activities that have a substantial relation to interstate commerce, including intrastate activities that have a substantial effect on interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). There can be little question that the SDWA, including its permitting process under a state UIC program, regulates activities that have a substantial relation to interstate commerce.

**[9]** Drinking water is an economic commodity. *See Sporhase v. Nebraska, ex rel. Dreyfus*, 458 U.S. 941, 954 (1982) (holding water is an article in interstate commerce). Most urban residents pay for drinking water that comes from their taps. Many rural residents pay for the construction and/or operation of wells to obtain water from underground aquifers. For reasons of necessity, taste or fashion, some people do not drink tap or well water. Instead, they pay for bottled water, which is often transported across state lines. Any regulatory scheme that affects the safety of a source, including an underground source, of drinking water inescapably has an effect on the supply of drinking water, and therefore on interstate commerce.

**[10]** The House Report on the SDWA demonstrates that unregulated injections "exert[ ] a substantial economic effect" on this commodity. *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) (consumption of home-grown wheat does not violate Commerce Clause, because home consumption impacts prices in interstate wheat market by reducing demand for commercial wheat); *see also Gonzales v. Raich*, 545 U.S. 1 (2005) (rejecting Commerce Clause challenge to criminalization of home-grown and home-consumed medical marijuana under Controlled Substances Act). Underground fluid injection can have disastrous consequences for drinking water and, in turn, for human health. Injected fluid is hard to trace once it enters the ground, and polluted aquifers are hard to remediate. Congress' cautious "preventive" approach requires permit applicants to show that their injections will not harm underground sources of drinking water. It presumes, until an applicant shows otherwise, that injections will contaminate an USDW. Although this approach may result in forbidding some injections that would not contaminate an USDW, it is a valid exercise of Congress' authority. "When it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." *Perez v. United States*, 402 U.S. 146, 154 (1971) (quoting *Westfall v. United States*, 274 U.S. 256, 259 (1927) (Holmes, J.)).

In *United States v. Lopez*, *supra*, the Supreme Court considered the constitutionality of the Gun-Free School Zones Act. The Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Id.* at 551. The Act neither regulated commercial activity nor contained a requirement that possession be connected to interstate commerce. *Id.* The Supreme Court held that the Act was beyond Congress' authority, writing that the Act's criminalization of gun possession near a school zone "ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561.

**[11]** The SDWA is fundamentally different from the Gun-Free School Zones Act. Drinking water is an article of commerce. The protection of drinking water — and its converse, the pollution of drinking water — have a direct effect on commerce. We recognize that in some instances the effect of Idaho's UIC permitting program may be to prevent injection of fluids that would not contaminate an USDW. But the federal government has the authority under the Commerce Clause to regulate injections broadly, out of an abundance of caution, as a means of providing effective protection of the purity of the nation's drinking water.

**[12]** We therefore conclude that § 300h-2(b)(2) does not exceed Congress' authority under the Commerce Clause.

IV.  Count Five: A "Materially False" Statement in a "Matter Within the Jurisdiction" of the United States

King was convicted under Count Five of making a "materially false . . . statement" in a "matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," in violation of 18 U.S.C. § 1001(a)(2).

King does not contest that he made a "materially false" statement to John Klimes when he said that the buried valve

at Well Five led to an irrigation pivot. In actual fact, the valve led to Well Five and allowed water to flow into the well. However, King contends that his conviction under § 1001(a)(2) must be set aside because Klimes is an Idaho agricultural inspector. King contends that his statement to Klimes was therefore not in a "matter within the jurisdiction . . . of the United States." We disagree.

[13] A false statement need not be made to a federal agent to support a conviction under § 1001(a)(2). *See United States v. Yermian*, 468 U.S. 63, 65 (1984); *United States v. Facchini*, 874 F.2d 638, 640-41 (9th Cir. 1989) (en banc). "Jurisdiction" is not defined in the statute, but "the most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). "Jurisdiction" is construed broadly to protect "the integrity of official inquiries." *Bryson v. United States*, 396 U.S. 64, 70 (1969). The statute is intended to cover "those deceptive practices which might result in the frustration of authorized government functions." *United States v. Green*, 745 F.2d 1205, 1210 (9th Cir. 1985). Section 1001(a)(2) jurisdiction extends wherever the federal government "has the power to exercise authority." *Rodgers*, 466 U.S. at 479. Jurisdiction requires a "direct relationship" between the authorized functions of an agency and the false statement. *Facchini*, 874 F.2d at 641.

We agree with King that § 1001(a)(2) cannot be read so broadly as to incorporate any false statement made to anyone regarding matters pertinent to the federal government. But this case does not exceed the outer boundaries of the statute. The most analogous case is *United States v. Oren*, 893 F.2d 1057 (9th Cir. 1990). In that case, we upheld a § 1001(a)(2) conviction against a defendant who forged an offer letter to the Trust for Public Lands in a scheme to induce the trust to purchase several hundred acres of undeveloped land at an inflated cost that would eventually be repurchased by the National Park Service. We held that the statement to the Trust

was within the jurisdiction of the federal government for purposes of § 1001, even though the Trust was a private entity, and even though the letter was never transmitted to the Park Service by the defendant. We upheld the conviction because the Park Service could have been led to purchase the land based on the false statement. *Id.* at 1064-65.

**[14]** In this case, there is a closer connection between the false statement and the federal government than there was in *Oren*. King knew that the Idaho Department of Agriculture had the authority to examine his wells and injection procedures. He also knew that the Department was trying to determine whether he was injecting water into deep wells without a permit. King lied to Klimes, one of the investigators, in order to defeat the investigation. A willful injection of fluid into a deep well without a permit from the State of Idaho is a federal crime under the SDWA. Therefore, King made a false statement in a "matter within the jurisdiction" of the United States.

## V. Motion for a New Trial

King moved for a new trial after the return of the jury's verdict. He asserted two grounds. First, he contended that on four occasions during trial prejudicial references were made to "waste" in violation of a pretrial order. Second, he contended that the government "manipulated" the testimony of John Chatburn "in order to leave jurors with the false impression that Mr. King had lied." The district court denied the motion. We discuss King's arguments in turn.

## A. References to "Waste"

The government originally indicted King for willfully injecting liquid waste without a permit. However, a superseding indictment alleged only that King willfully injected "water" without a permit. The district court entered a pretrial order precluding any references, in evidence presented to the

jury, to "wastewater, manure, or waste material," on the ground that such references could be prejudicial to King.

Despite the pretrial order, three government witnesses briefly referred to "waste" in their testimony. In addition, the government displayed a diagram on a screen for a few seconds on which the source of the water was labeled "waste pond." The district court found that the three references and the brief display were inadvertent.

[15] After the first reference to "waste," the court gave a limiting instruction. King did not request limiting instructions after the other references or after the display. In its final instructions to the jury, the district court instructed the jury not to consider evidence that it had been instructed to ignore. A joint stipulation by the parties, presented to the jury, stated that the injections consisted of surface water from creeks. The district court held that its limiting instruction and the stipulation cured any possible prejudice that might have been caused by the three references and brief display. The district court did not abuse its discretion in so holding.

### B.    Chatburn's Testimony

During a pretrial suppression hearing, Chatburn testified that on two occasions King denied injecting "waste water" into wells at Double C. The district court's order forbade any reference to "waste" in testimony before the jury. Chatburn testified at trial that on the first occasion he spoke to King about allegations that "fluids" were being injected. He testified that on the second occasion King denied "what had been alleged."

King contended in his motion for a new trial, and contends here, that the government unfairly "manipulated" Chatburn's testimony. He points out that Chatburn testified at trial that King denied injecting fluids, but that King had denied only injecting "waste water," leaving open the possibility that he

had not denied injecting clean water. Therefore, according to King, Chatburn's testimony gave a "false impression" to the jury.

King's argument is too clever by half. It was King who insisted on the protective order that prevented Chatburn from testifying to what King had actually said. King is now seeking to take unfair advantage of the order by characterizing the good-faith replacement of "waste water" with "fluid" in Chatburn's testimony as "manipulation."

[16] Further, we note that King was not charged in the indictment with lying to Chatburn. Rather, he was charged with lying to Klimes. The purpose of Chatburn's testimony was to show that King injected fluids "willfully." Chatburn's testimony was only a small part of the evidence presented to the jury that King acted "willfully." If there was any error in presenting Chatburn's testimony (which we hold there was not), it was clearly harmless.

## Conclusion

The district court in this case was thorough in its legal analysis and meticulous in its protection of King's rights at trial. We AFFIRM the conviction.