Filed 8/14/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>　　　Plaintiff and Appellant,<br><br>　v.<br><br>DEPARTMENT OF CONSERVATION,<br><br>　　　Defendant and Respondent;<br><br>AERA ENERGY LLC et al.,<br><br>　　　Interveners and Respondents. | A149896<br><br>(Alameda County<br>Super. Ct. No. RG15769302) |

　　　The Center for Biological Diversity (Appellant) sought a writ of mandate directing the California Department of Conservation, Division of Oil, Gas, and Geothermal Resources (the Department) to order the immediate closure of oil and gas wells injecting fluids into certain underground aquifers.  Appellant argued the Department had a mandatory duty to do so under the federal Safe Drinking Water Act (SDWA or the Act; 42 U.S.C. § 330f *et seq.*), federal regulations promulgated pursuant to the Act, and a memorandum of agreement executed by the Department setting forth its responsibilities under the Act.  The trial court denied the petition, and we affirm.

BACKGROUND

*The Safe Drinking Water Act*

　　　"The SDWA establishes a federally mandated, state-administered regulatory scheme for the protection of drinking water."  (*U.S. v. King* (9th Cir. 2011) 660 F.3d

1

1071, 1077 (*King*).)  The Act includes provisions to protect current or potential underground drinking water sources.  (42 U.S.C. §§ 300h to 300h-8.)  To this end, the Act directs the establishment of statewide programs to control underground injections (underground injection control programs, or UIC programs).[1]  (42 U.S.C. § 300h-1.)  All such programs "shall prohibit . . . any underground injection in such State which is not authorized by a permit," and "shall require" permit applicants to show "that the underground injection will not endanger drinking water sources . . . ."  (42 U.S.C. §§ 300h, subd. (b)(1)(A)-(B), 300h-4, subd. (a).)[2]

Regulations promulgated pursuant to the Act by the United States Environmental Protection Agency (EPA) provide EPA "shall protect . . . all aquifers and parts of aquifers[3] which meet the definition of 'underground source of drinking water' . . . , except to the extent there is an applicable aquifer exemption [and other exceptions not relevant here]."  (40 C.F.R. § 144.7(a).)  The regulations define "underground source of drinking water" broadly as an aquifer which either supplies a public water system or is large enough and pure enough to potentially supply a public water system in the future, and which has not been exempted by EPA.  (40 C.F.R. § 144.3.)[4]  EPA may exempt an aquifer that otherwise meets the definition of an underground source of drinking water if

---

[1] " 'Underground injection' " is defined as "the subsurface emplacement of fluids by well injection."  (42 U.S.C. § 300h, subd. (d)(1).)  As relevant here, such fluids include those brought to the surface in connection with oil or gas production and those used for enhanced oil or gas recovery.  (40 C.F.R. § 146.5(b).)

[2] A state program may also "authorize underground injection by rule," instead of by permit.  (42 U.S.C. § 300h, subd. (b)(1)(A).)

[3] "Aquifer means a geological 'formation,' group of formations, or part of a formation that is capable of yielding a significant amount of water to a well or spring."  (40 C.F.R. § 144.3.)

[4] "*Underground source of drinking water (USDW)* means an aquifer or its portion: [¶] (a)(1) Which supplies any public water system; or [¶] (2) Which contains a sufficient quantity of ground water to supply a public water system; and [¶] (i) Currently supplies drinking water for human consumption; or [¶] (ii) Contains fewer than 10,000 mg/l total dissolved solids; and [¶] (b) Which is not an exempted aquifer."  (40 C.F.R. § 144.3.)

2

it determines the aquifer "cannot now and will not in the future serve as a source of drinking water," for example, if its location or contamination makes such use impractical. (40 C.F.R. § 146.4(b).)[5] We will refer to aquifers which meet the definition of underground source of drinking water and, in accordance with that definition, have not been designated as exempt by EPA, as "nonexempt aquifers."

The underground injection control program in a given state may be administered by EPA, or the state may apply to EPA for primary enforcement responsibility for the program, referred to as primacy. (42 U.S.C. § 300h-1, subds. (b) & (c).) A state may obtain primacy either by showing its underground injection control program meets requirements set forth in EPA's regulations (42 U.S.C. § 300h-1, subd. (b)(1)(A)(i)) or, with respect to injections associated with oil and gas production, by demonstrating its program meets certain statutory requirements and will be effective in "prevent[ing] underground injection which endangers drinking water sources" (42 U.S.C. § 300h-4, subd. (a)). If a state has been granted primacy, EPA retains the authority to revise the program or revoke primacy. (40 C.F.R. §§ 145.32-145.34.) EPA also retains the sole authority to approve aquifer exemptions. (40 C.F.R. § 144.7(b)(2)-(3).)

*California's Underground Injection Control Program*

In 1983, EPA granted California primacy over underground injections associated with oil and gas production, pursuant to the primacy provision requiring the state to prove

---

[5] An aquifer may be exempted if "(a) It does not currently serve as a source of drinking water; and [¶] (b) It cannot now and will not in the future serve as a source of drinking water because: [¶] (1) It is mineral, hydrocarbon or geothermal energy producing, or can be demonstrated by a permit applicant as part of a permit application for a Class II or III operation to contain minerals or hydrocarbons that considering their quantity and location are expected to be commercially producible. [¶] (2) It is situated at a depth or location which makes recovery of water for drinking water purposes economically or technologically impractical; [¶] (3) It is so contaminated that it would be economically or technologically impractical to render that water fit for human consumption; or [¶] (4) It is located over a Class III well mining area subject to subsidence or catastrophic collapse; or [¶] (c) The total dissolved solids content of the ground water is more than 3,000 and less than 10,000 mg/l and it is not reasonably expected to supply a public water system." (40 C.F.R. § 146.4.)

its program will be effective in preventing injections endangering drinking water sources. (48 Fed.Reg. 6336-01 (Feb. 11, 1983) [primacy approved pursuant to § 1425 of the Act]; Pub.L. No. 96-502, § 2(a) (Dec. 5, 1980) 94 Stat. 2737 [§ 1425 of the Act codified at 42 U.S.C. § 300h-4].)  As part of this process, in 1982 EPA and the Department executed a memorandum of agreement (MOA) establishing the respective responsibilities of the two agencies in the administration of California's underground injection control program.[6] Under the MOA, it is the Department's responsibility to approve or deny permits for underground injections.  The MOA also memorializes EPA's exemption of multiple California aquifers, and provides: "Aquifer exemptions made subsequent to the effective date of this Agreement shall not be effective until approved by [EPA] in writing. [¶] After the effective date of this Agreement, an aquifer exemption must be in effect prior to or concurrent with the issuance of a Class II permit for injection wells into that aquifer."[7]

Between 2011 and 2014, the Department became aware that it had issued permits for potentially thousands of oil and gas wells injecting into nonexempt aquifers or nonexempt portions of aquifers.  Two unrelated causes led to this massive error.  First, apparently due to poor oversight by the Department, regional offices failed to identify the correct boundaries of exempt aquifers.  For example, regional offices looked only at contour maps without also considering depth, and therefore permitted injections above or below an exempt aquifer; or issued permits based on a list of exempt aquifers without realizing that only a portion of the relevant aquifer was exempt.  Second, the Department became aware that there were two nearly identical versions of the MOA: in one version, the Department's request for exemption of eleven aquifers (hereafter, the Eleven Aquifers) was approved; in the other, it was denied.  After the state was granted primacy, EPA and the Department treated the former as the operative MOA and the Department issued permits authorizing injections into the Eleven Aquifers.  The latter version of the

---

[6] At the time, the Department was called the Division of Oil and Gas.  (See Stats. 1992, ch. 999, § 2 [changing name to Division of Oil, Gas, and Geothermal Resources].)

[7] The MOA incorporates the definition of Class II wells set forth in EPA's regulations as wells associated with oil and gas production.  (See 40 C.F.R. § 146.5(b).)

4

MOA was rediscovered by Department staff in 2011.  Upon this discovery, the Department determined there was little evidence justifying exemption of the Eleven Aquifers, and any exemption may have been procedurally improper.  Although the exemption status of the Eleven Aquifers was ambiguous during the relevant time, for convenience we will include them in the term "nonexempt aquifers."

The Department notified EPA and the two agencies worked together to develop a plan to remedy the inappropriately-issued permits, as documented in correspondence between the agencies.[8]  The basic structure of the plan, as finalized in March 2015, was as follows.  The Department would review the thousands of injection wells which potentially injected into nonexempt aquifers, prioritizing those which posed the greatest risk to drinking water sources.  During the review process, if the Department determined an injection well potentially impacted water supply wells, it would order that injection well to immediately cease operation.[9]  For many of the remaining wells, there was reason to think the aquifers met the criteria for exemption.  The Department would allow injections to continue for a limited time, during which time the operator could request an exemption for that aquifer.[10]  If, by the expiration of the allotted time, EPA had not granted an exemption, the injections must cease.  The amount of time in which to obtain an aquifer exemption varied depending on the type of aquifer.  For injections into aquifers with high quality water, the deadline was October 2015.  For injections into the Eleven Aquifers, the deadline was December 2016.  For injections into aquifers with

---

[8] The State Water Resources Control Board (Water Board) worked in conjunction with the Department on the development and implementation of this plan.

[9] The Department began issuing cessation orders in 2014.

[10] The exemption process begins when the operator submits a lengthy, technical application to the Department.  The Department and the Water Board determine whether the application merits consideration by EPA; if so, a public comment period and hearing must be provided.  (Pub. Resources Code, § 3131, subd. (b).)  After considering the public comments, if the Department and Water Board still consider the application meritorious, the Department submits it to EPA.  (*Id.*, subd. (c).)  EPA then conducts its own review.  (40 C.F.R. § 144.7(b).)

5

relatively poor quality water or with oil-containing water (which "could only be fit for beneficial use following extensive and expensive purification"), the deadline was February 2017.[11] The Department could issue new permits for injections into the third category of aquifer, under certain conditions, but any such permits would be subject to the February 2017 deadline. In a March 2015 letter, EPA approved this approach, referring to it as the "corrective action plan." As the corrective action plan was implemented, EPA occasionally approved modifications.

In April 2015, the Department issued emergency regulations codifying the corrective action plan's schedule. The emergency regulations were replaced by permanent regulations containing the same schedule. (Cal. Code Regs., tit. 14, §§ 1760.1, 1779.1.)

*Trial Court Proceedings*

In May 2015, Appellant filed the underlying action seeking a writ of mandate (Code Civ. Proc., § 1085) and declaratory relief based on the Department's failure to order the immediate closure of wells injecting into nonexempt aquifers.[12] The trial court granted motions to intervene by certain energy companies and industry groups (collectively, Intervenors).[13] In September 2016, the trial court issued a statement of decision denying Appellant's claims and entered judgment accordingly.

---

[11] The Department subsequently determined approximately 175 wells were subject to the first two deadlines and more than 5,500 were subject to the third deadline.

[12] Appellant also challenged the emergency regulations (which had not yet been replaced by permanent regulations). Appellant does not pursue this challenge on appeal. The Sierra Club was an additional plaintiff below but is not a party to this appeal.

[13] We refer to Intervenors and the Department collectively as Respondents. One of the energy companies has been dismissed as a party to this appeal.

DISCUSSION

I. *Mootness*

Under the corrective action plan, all injections into nonexempt aquifers were to cease by February 2017.  Such an event would render this appeal moot.  (See *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1031 ["An appeal from an order denying an injunction may be dismissed as moot if the act sought to be enjoined is performed while the appeal is pending."].)[14]  Appellant and the Department filed motions asking us to take additional documentary evidence of postjudgment correspondence between the Department and EPA.  (See Code Civ. Proc., § 909; Cal. Rules of Court, rule 8.252(c)(3).)  This correspondence demonstrates that injections into nonexempt aquifers have continued past the February 2017 deadline, if the Department had determined by that date that the nonexempt aquifer met the criteria for exemption, but the exemption process (see fn. 10, *ante)* was still ongoing.

"It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'  [Citation.]  This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .'  [Citation.] . . . 'Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and [former] rule 23 of the California Rules of Court, the authority should be exercised sparingly.  [Citation.]  Absent exceptional circumstances, no such findings should be made."  (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  We conclude that resolving the mootness question constitutes exceptional circumstances warranting our taking the additional documentary

---

[14] Although no party argues the appeal is moot, "the court may examine a suggestion of mootness on its own motion."  (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 865.)

evidence for this limited purpose.[15]  (See *Speirs v. Bluefire Ethanol Fuels, Inc.* (2015) 243 Cal.App.4th 969, 980 ["We grant the parties' respective motions to admit new documentary evidence on appeal relevant to the issue of whether [the appellant]'s appeal is moot."].)  Appellant also relies on this additional evidence in arguing the judgment should be reversed.  We find no extraordinary circumstances warranting our consideration of the evidence for such purposes, and we thus do not consider it in determining the merits of the appeal.

Because the additional evidence demonstrates injections into nonexempt aquifers continued past the February 2017 deadline, we conclude the appeal is not moot.  We now turn to the merits of Appellant's claims.

## II.  *Legal Standard*

A writ of mandate may issue "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ."  (Code Civ. Proc., § 1085, subd. (a).)  "Generally, mandamus is available to compel a public agency's performance or to correct an agency's abuse of discretion when the action being compelled or corrected is ministerial.  [Citation.]  'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.  Discretion . . . is the power conferred on public functionaries to act officially according to the dictates of their own judgment.  [Citation.]'  [Citations.]  Mandamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner."  (*AIDS Healthcare Foundation v. Los Angeles*

---

[15] The additional documentary evidence is a January 17, 2017 letter from the Department and the Water Board to EPA; a January 25, 2017 letter from EPA to the Department and the Water Board; a March 7, 2017 letter from the Department to EPA; a March 16, 2017 letter from the Department and the Water Board to EPA, and a May 10, 2017 letter from the Department and the Water Board to EPA.  We deny the parties' alternative requests that we take judicial notice of the same documents.  We deny as irrelevant the parties' requests that we take judicial notice of filings in a separate litigation.

8

*County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700–701 (*AIDS Healthcare*).)

"We independently review the petition to determine whether [Appellant] has stated a viable cause of action for mandamus relief." (*AIDS Healthcare, supra,* 197 Cal.App.4th at p. 700.)

III. *The Safe Drinking Water Act*

Appellant contends the Act and its regulations impose a mandatory duty on the Department to immediately cease the permitted injections into nonexempt aquifers. We disagree.

The Act provides that all state programs to administer its provisions "shall require . . . that the applicant for the permit to inject must satisfy the State that the underground injection will not endanger drinking water sources . . . ." (42 U.S.C. §§ 300h, subd. (b)(1)(B), 300h-4, subd. (a).) The Act further provides: "Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant may result in such system's not complying with any national primary drinking water regulation or may otherwise adversely affect the health of persons." (42 U.S.C. § 300h, subd. (d)(2).) Regulations promulgated pursuant to the Act provide EPA "shall protect" all nonexempt aquifers. (40 C.F.R. 144.7(a).) The parties dispute whether these statutory and regulatory provisions impose present duties on the Department to ensure permitted injections "will not endanger drinking water sources" and to "protect" nonexempt aquifers. We will assume, without deciding, that they do. The question is whether such duties require the Department to order the immediate cessation of injections into nonexempt aquifers.

"While a writ of mandate may issue to compel compliance with a ministerial duty—an act the law specifically requires—it may not issue to compel an agency to perform that legal duty in a particular manner, or control its exercise of discretion by forcing it to meet its legal obligations in a specific way." (*Marquez v. State Dept. of*

9

*Health Care Services* (2015) 240 Cal.App.4th 87, 118–119 (*Marquez*).) " 'Even if mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must exercise significant discretion to perform the duty.' " (*AIDS Healthcare, supra,* 197 Cal.App.4th at p. 701; see also *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348 ["[T]o establish a mandatory duty [for purposes of Gov. Code, § 815.6] . . . '[i]t is not enough . . . that the public entity or officer have been under an obligation to perform a function *if the function itself involves the exercise of discretion.*' "].)

*AIDS Healthcare* is instructive. The petitioners sought a writ of mandate directing the Los Angeles health officer to require performers in adult films use condoms and obtain hepatitis B vaccinations, to curb the spread of sexually transmitted diseases. (*AIDS Healthcare, supra,* 197 Cal.App.4th at p. 696.) The petitioners relied on statutes providing a health officer aware of communicable diseases " 'shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases' " and, with respect to sexually transmitted diseases, shall take " 'all measures reasonably necessary to prevent the transmission of infection.' " (*Id.* at p. 701.) The Court of Appeal, considering the statutory language and statutory scheme, concluded these provisions "impose a mandatory duty on a health officer to take measures to prevent the spread of contagious and communicable diseases," but "leav[e] the course of action to the health officer's discretion." (*Id.* at p. 702.) Because "[t]he decision on what steps to take to control the spread of sexually transmitted diseases is entrusted to the [public agency]," the petitioners were not entitled to a writ mandating their preferred steps. (*Id.* at p. 704.)

Similarly, in *Marquez,* the petitioners sought a writ of mandate to compel the state agency administering California's Medicaid program, Medi-Cal, to provide medical services to beneficiaries who were mistakenly "coded" in the agency's database as having other health insurance coverage and denied Medi-Cal services on that ground. (*Marquez, supra,* 240 Cal.App.4th at pp. 92, 117.) The petitioners relied in part on a statute requiring "Medi–Cal's 'health care benefits and services' 'shall be provided' to eligible state residents to the extent those services and benefits are not 'provided nor available

10

under other contractual or legal entitlements of the person.' " (*Id*. at pp. 117–118.) *Marquez* explained that the agency had existing procedures to correct code errors, after which the beneficiary could receive Medi-Cal services. The petitioners' "arguments, therefore, do not show that [the agency] fails to comply with [the statute], but merely debate *how* [the agency] should comply." (*Id.* at p. 118.) Because mandamus "may not issue to compel an agency to perform [a] legal duty in a particular manner, or control its exercise of discretion by forcing it to meet its legal obligations in a specific way," the denial of the writ was proper. (*Id.* at pp. 118–119.)

Like the statutes at issue in *AIDS Healthcare* and *Marquez,* the Act and regulations oblige the Department to "protect" nonexempt aquifers and ensure injections do "not endanger" drinking water sources, but do not mandate a specific course of action to carry out these obligations. In contrast, for example, the Act flatly requires states to "prohibit . . . any underground injection in such State which is not authorized by a permit issued by the State . . . ." (42 U.S.C. § 300h, subd. (b)(1)(A).) The lack of any similar specificity with respect to injections into nonexempt aquifers suggests an intent to "leav[e] the course of action to the . . . discretion" of the Department. (*AIDS Healthcare, supra,* 197 Cal.App.4th at p. 702.)[16] We conclude that, while the Department must exercise its discretion to protect nonexempt aquifers, it has the discretion to decide how best to do so.

It may be that, in the ordinary course of events, the only way to protect nonexempt aquifers is to prohibit injections into them. (See *AIDS Healthcare, supra,* 197 Cal.App.4th at p. 703 ["there is a recognized exception where if the facts lead to only one

---

[16] The Act defines endangering drinking water sources as injections into "underground water which supplies or can reasonably be expected to supply any public water system" and which may "adversely affect the health of persons." (42 U.S.C. § 300h, subd. (d)(2).) As noted above, the Department concluded many of the nonexempt aquifers likely met the criteria for exemption; they thus could not reasonably be expected to supply a public water system. Although Appellant argues generally that injections caused harmful contamination of nonexempt aquifers, Appellant does not contend any actual or reasonably potential drinking water sources were harmed.

choice, the court may compel the agency or official to make that choice"].) This case, however, presents extraordinary facts—to wit, the belated discovery of thousands of permitted wells potentially injecting into nonexempt aquifers.

The Department's determination of how to best protect nonexempt aquifers in this extraordinary circumstance was a fact-based, risk-benefit analysis, requiring it to balance competing interests, and conducted in consultation with EPA—in other words, a quintessentially discretionary decision. The Department considered the option of ordering the immediate cessation of all such injections, as explained in its response to public comments urging it to do so, made in connection with the proposed (and subsequently enacted) permanent regulations. The Department first noted this approach "could only be effective if enforced in a vastly over-inclusive manner" because "determining whether any given well is injecting into a [nonexempt aquifer] requires substantial and careful analysis." Further, immediately ceasing all injections into potentially nonexempt aquifers would be "logistically difficult, as well as an inefficient use of agency resources" and, because due process entitles affected companies the right to appeal cessation orders, "would undoubtedly invite widespread, vigorous opposition, thereby thwarting the intended immediacy and needlessly jeopardizing the entire objective."

The Department further reasoned that, in contrast, the corrective action plan would enable it "to focus its resources on identifying and halting those injection activities posing the greatest risk to aquifers with the best potential to serve as sources of drinking water, while also providing fair notice to the regulated industry so as to incentivize cooperation and speed compliance." The Department concluded: "the compliance schedule set forth in the proposed regulations, operating in conjunction with ongoing interagency review and targeted exercise of administrative enforcement tools, is the most efficient, balanced, and demonstrably effective mechanism by which to achieve the relevant federal and state objectives for protection of groundwater resources." The Department thus concluded the corrective action plan was the best means to protect drinking water sources. Appellant's disagreement with this assessment "do[es] not show

that [the Department] fails to comply with [the Act and its regulations], but merely debate[s] *how* [the Department] should comply." (*Marquez, supra,* 240 Cal.App.4th at p. 118.) The Act and regulations leave this determination to the Department.

*California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, relied on by Appellant, is distinguishable. The relevant statute in that case required the state agency to provide " ' "such methods and procedures" ' " in setting Medi-Cal provider reimbursement rates " ' "to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the [Medi-Cal] plan at least to the extent that such care and services are available to the general population in the geographic area . . . ." ' " (*Id.* at p. 565.) After the state agency changed its reimbursement rate formula in order to reduce rates, it "candidly admit[ted] that no . . . studies were performed" considering the impact of this change "on the statutory factors of efficiency, economy, quality, and access to care . . . ." (*Id.* at pp. 566, 573.) The Court of Appeal concluded that, while the agency " 'need not follow a rigid formula' . . . , it must rely on something other than purely budgetary reasons." (*Id.* at p. 577.) The agency thus had discretion in deciding how to fulfill its statutory duty to consider certain factors, but it failed to do so in any fashion. Here, in contrast, the Department took action to fulfill its duties to protect underground drinking water, did exercise its discretion, and selected what it considered to be the best method to do so.

We do not dispute Appellant's contention that the Act is preventative in nature, and that injections may be prohibited under the Act absent proof that they will harmfully contaminate the aquifer. (See *King, supra,* 660 F.3d at p. 1079 ["The injection provisions of the SDWA are 'preventive.' [Citation.] Congress concluded that the most effective way to ensure clean drinking water was to prevent pollution of underground aquifers in the first place, rather than to clean up polluted aquifers after the fact. . . . [I]n the absence of a showing by the applicant that a proposed injection is safe, the SDWA presumes that the injection will endanger an [underground source of drinking water]."].) These principles inform the Department's performance of its duty to protect drinking water

sources. But they do not, in this unusual case, impose a mandatory duty to immediately cease all injections into nonexempt aquifers, nor do they render the Department's considered refusal to do so an abuse of discretion.

We note that EPA approved the corrective action plan. Had EPA believed the Act and its regulations required the Department to instead order the immediate cessation of all injections into nonexempt aquifers, it presumably would have directed the Department to do so. EPA's construction of the Act and its regulations thus supports our conclusion. (See *Association of California Ins. v. Jones* (2017) 2 Cal.5th 376, 390 ["In exercising our ultimate responsibility to construe the statutory scheme, . . . we ' " 'accord[] great weight and respect' " ' to the administrative agency's construction."].)

In sum, the Department did not ignore its duties to protect nonexempt aquifers and to ensure that injections do not endanger sources of drinking water. (See *AIDS Healthcare, supra,* 197 Cal.App.4th at p. 704 ["[m]andamus will lie to command the exercise of discretion, that is, to compel some action" if the public agency "has failed to act, and its failure to act is arbitrary"].) Instead, it exercised its discretion to conclude that the corrective action plan was the best means to fulfill those duties. Because "[m]andamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner" (*AIDS Healthcare, supra,* 197 Cal.App.4th at pp. 700–701), Appellant is not entitled to a writ of mandate on this ground.

IV. *Memorandum of Agreement*

Appellant argues, in the alternative, that the MOA imposes a mandatory duty on the Department to immediately cease injections into nonexempt aquifers. The MOA provides: "After the effective date of this Agreement, an aquifer exemption must be in effect prior to or concurrent with the issuance of a [oil and gas production] permit for injection wells into that aquifer." As explained below, we conclude that the corrective

14

action plan constituted a nonsubstantial revision to California's underground injection program authorizing a limited, temporary exception to this requirement in the MOA.[17]

A. *The MOA Is Part of California's Underground Injection Control Program*

Intervenors contend the MOA is not formally part of California's underground injection control program. We disagree.

The federal regulation approving California's underground injection program provides, in its entirety:

"The UIC program for Class II wells in the State of California, except those on Indian lands, is the program administered by the California Division of Oil and Gas, approved by EPA pursuant to SDWA section 1425.

"(a) *Incorporation by reference*. The requirements set forth in the State statutes and regulations cited in this paragraph are hereby incorporated by reference and made a part of the applicable UIC program under the SDWA for the State of California. This incorporation by reference was approved by the Director of the Federal Register on June 25, 1984.

"(1) California Laws for Conservation of Petroleum and Gas, California Public Resources Code Div. 3, Chapt. 1, §§ 3000–3359 (1989);

"(2) California Administrative Code, title 14, §§ 1710 to 1724.10 (May 28, 1988).

"(b) The Memorandum of Agreement between EPA Region IX and the California Division of Oil and Gas, signed by the EPA Regional Administrator on September 29, 1982 [the MOA].

"(c) *Statement of legal authority*.

"(1) Letter from California Deputy Attorney General to the Administrator of EPA, 'Re: Legal Authority of California Division of Oil and Gas to Carry Out Class II Injection Well Program,' April 1, 1981;

---

[17] This conclusion renders it unnecessary for us to decide whether, as Respondents contend, Appellant lacks standing to enforce the MOA and/or lacks a beneficial interest in the MOA.

"(2) Letter from California Deputy Attorney General to Chief of California Branch, EPA Region IX, 'Re: California Application for Primacy, Class II UIC Program,' December 3, 1982.

"(d) The Program Description and any other materials submitted as part of the application or as supplements thereto." (40 C.F.R. § 147.250.)

Intervenors contend that only the state statutes and regulations set forth in paragraph (a) are part of the state's underground injection program, because that paragraph states they are incorporated and "made a part of the applicable UIC program." Under this interpretation, the materials listed in the remaining paragraphs—the MOA, specified letters, program description, and other materials submitted with the state's application—are included in the regulation with no apparent legal effect or purpose. We are not inclined to construe the regulation in such a nonsensical manner. (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 850 [in interpreting statutes, "[a] construction making some words surplusage is to be avoided"]; *Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 523 ["Rules of statutory construction govern our interpretation of regulations promulgated by administrative agencies."].)

Moreover, as Appellant notes, the regulation *as enacted* includes the following sentence at the beginning of the opening paragraph: "This program consists of the following elements, as submitted to EPA in the State's program application:" (49 Fed. Reg. 20138-01, 20202 (May 11, 1984).) The enacted version thus makes clear that all the materials listed in paragraphs (a) through (d) are part of the state program. Although the regulation as codified omits this sentence, "numerous cases have stated that when there is a conflict between a challenged law as enacted and as codified, the court must treat the law as enacted as the relevant and controlling law." (*In re A.G.* (2010) 186 Cal.App.4th 1454, 1460–1461.) Accordingly, we conclude the MOA is a component of the state's underground injection control program.

B. *The Corrective Action Plan Constituted a Nonsubstantial Revision of California's Program*

Federal regulations set forth the procedure to revise a state underground injection control program: "The State shall submit a modified program description, Attorney General's statement, Memorandum of Agreement, or such other documents as EPA determines to be necessary under the circumstances," and EPA "shall approve or disapprove program revisions based on the requirements of this part and of the Safe Drinking Water Act." (40 C.F.R. § 145.32(b)(1), (3).) The regulations contemplate two types of program revision, substantial and nonsubstantial. (40 C.F.R. § 145.32(b)(2), (4).) Public notice and comment are required for substantial revisions, but not for nonsubstantial revisions. (40 C.F.R. § 145.32(b)(2).) Approval of substantial revisions must be published in the Federal Register, but approval of nonsubstantial revisions may be by letter from EPA "to the State Governor or his designee." (40 C.F.R. § 145.32(b)(4).) "The decision of whether a proposed UIC program revision is substantial or nonsubstantial lies with the [EPA]." (*Western Nebraska Resources Council v. E.P.A.* (8th Cir. 1986) 793 F.2d 194, 199.)

Respondents contend the corrective action plan constituted a nonsubstantial program revision. There is support for this in the record. In a July 2014 letter to the state, EPA requested information relating to the Department's review of permitted injection wells to determine whether they were injecting into nonexempt aquifers and relating to the Eleven Aquifers.[18] This letter requested the information pursuant to EPA's "authority under 40 C.F.R. § 145.32," the regulation governing procedures for revisions to state programs. A December 2014 letter from EPA "highlights the main areas of recent discussion and provides direction for the State's submittal of a *program revision plan* by February 6, 2015." (Italics added.) The letter addressed the Department's review of injection wells that may be injecting into nonexempt aquifers, directed all such injections must cease by February 2017 unless EPA has approved an exemption, and provided "[t]he State's program revision plan" should ensure EPA has adequate time to

---

[18] The letter also requested information relating to a 2011 EPA audit of California's underground injection control program.

review any requests for exemption of the Eleven Aquifers by December 2016. The letter concluded: "We . . . anticipate receiving your program revision plan by February 6, 2015."[19]

On February 6, 2015—the designated date—the Department wrote EPA a letter containing a detailed proposal, including a proposed compliance schedule for reviewing and ceasing permitted injections into nonexempt aquifers. The letter concluded: "we are committed to *revising the UIC program* efficiently, and with public safety as a first priority." (Italics added.) In March 2015, EPA wrote the Department, approving the corrective action plan, which adopted the state's proposed plan with several modifications. The Department subsequently wrote EPA periodic updates on its progress and refinements or modifications of the approved plan. EPA responded, at times approving proposed changes.

Appellant argues neither EPA nor the Department characterized the corrective action plan as a program revision. We are not persuaded that such a formality is necessary to effectuate a nonsubstantial plan revision. The federal regulations contemplate that nonsubstantial revisions may be executed informally, without notice and comment or publication in the Federal Register. (40 C.F.R. § 145.32(b).) The only requirement for nonsubstantial revisions is the state submit "such . . . documents as EPA determines to be necessary under the circumstances" and the revisions be approved by letter from EPA to the state. (40 C.F.R. § 145.32(b)(1), (4).)[20]

---

[19] Appellant cursorily asserts this reference to a " 'program revision plan' " "was not to a formal revision of California's UIC program pursuant to the regulations, but instead only to [the Department]'s plan to review and address the deficiencies uncovered by" a 2011 audit by EPA. Appellant provides no further analysis or argument on this contention, which is not supported by the record.

[20] Although the regulations provide the letter be from "the [EPA] Administrator to the State Governor or his designee" (40 C.F.R. § 145.32(b)(4)), Appellant does not argue the correspondence from EPA's regional office to the Department failed to constitute a nonsubstantial program revision for that reason. We note that a 1984 EPA guidance memorandum included in the record delegates to Regional Administrators the authority to approve nonsubstantial revisions to underground injection control programs.

18

*HRI, Inc. v. E.P.A.* (10th Cir. 2000) 198 F.3d 1224 is instructive. EPA approved New Mexico's underground injection control program for all applicable wells, " 'except for those on Indian lands.' " (*Id.* at p. 1232.) Initially, EPA treated an area known as "Section 8" as covered by the state program, but the Navajo Nation subsequently contended Section 8 was Indian land. (*Id*. at pp. 1234–1235.) Following two years of communications between EPA, the relevant state agency, and the Navajo Nation, EPA issued a letter to the state agency that "stated EPA's position requiring federal permitting for . . . Section 8." (*Id.* at p. 1235.)[21] The Tenth Circuit concluded that this "determin[ation] that certain lands are outside the reach of New Mexico's program as previously approved" is appropriately "characterized as a state program revision" and, moreover, "is reasonably construed as a 'nonsubstantial program revision.' " (*Id.* at pp. 1242–1243.) The court reached this conclusion without any apparent reference in EPA's letter or the preceding correspondence to such a revision.

Here, EPA's letters to the Department acknowledged that the Department was not in compliance with its underground injection control program, directed the Department to prepare a "program revision plan," and eventually approved the corrective action plan (and subsequent modifications). We conclude EPA approved a nonsubstantial revision to California's program—to wit, a limited, temporary exception to the prohibition of permitted injections into nonexempt aquifers.[22]

---

[21] EPA concluded the status of Section 8 was in dispute, triggering an EPA policy providing that disputed lands will be regulated by EPA-administered programs pending the resolution of the dispute. (*Id*. at pp. 1233, 1235.)

[22] Appellant argues even if the state program was revised by the corrective action plan, the Department is not in compliance with that plan because injections into nonexempt aquifers continued past February 2017. As noted in part I of this opinion, we consider the postjudgment evidence that injections continue past this date solely for mootness purposes. Even if we were to consider the evidence in considering the merits, however, we would reject Appellant's contention. As we have noted, EPA occasionally approved modifications to the original corrective action plan. In January 2017, the EPA approved another such modification, allowing injections into nonexempt aquifers to continue after February 2017 where the Department determined that the aquifer met the criteria for

19

The parties dispute whether the MOA was amended according to its terms. In light of our conclusion that the corrective action plan constituted a revision of California's underground injection control program—of which the MOA is one component—an additional amendment of the MOA was not necessary. In any event, we agree with Respondents that the MOA was likely amended by the same correspondence that effected the program revision. The MOA provides: "This Agreement may be modified upon the initiative of either party in order to ensure consistency with State or Federal statutory or regulatory modifications or supplements, or for any other purpose mutually agreed upon. Any such modifications or supplements must be in writing and must be signed by the Supervisor [of the Department] and Regional Administrator." Appellant argues no writing was signed by *both* the Department and EPA, but it is unclear whether the MOA precludes amendment by separate signed writings. In any event, "[a]s a general rule, if a contract provides that a writing is necessary to amend it, the parties may, by their conduct, waive such a provision." (*Epic Medical Management, LLC v. Paquette* (2015) 244 Cal.App.4th 504, 512, fn. 5.)

In sum, while the MOA prohibits the Department from permitting injections into nonexempt aquifers, EPA approved a nonsubstantial program revision that temporarily suspended this prohibition in limited, specified circumstances. The MOA thus does not entitle Appellant to a writ of mandate directing the Department to order all injections into nonexempt aquifers cease immediately.[23]

---

exemption but the exemption process was ongoing. This is reasonably construed as a nonsubstantial program revision modifying the prior program revision.

[23] Because we have concluded Appellant is not entitled to a writ of mandate based on the Act, its regulations, or the MOA, we need not decide additional arguments disputed by the parties: the availability of an adequate legal remedy, the trial court's jurisdiction to void injection well permits, whether Appellant established prejudice, and whether EPA and/or permit holders are indispensable parties to this litigation. In addition, for the same reasons that we reject Appellant's mandamus claim, we reject Appellant's claim for declaratory relief; we thus need not decide the Department's contention that Appellant waived this claim. Finally, Appellant contends some of the injection wells are operating without permits (a contention the Department disputes) in support of its argument that, to

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

---

the extent the trial court concluded permits cured the lack of exemptions, it erred. Because we reach no such conclusion, we need not resolve this issue.

_____

Jones, P.J.

We concur:

_____

Needham, J.

_____

Bruiniers, J.

A149896

Trial court:                                         Alameda County Superior Court

Trial judge:                                        Hon. George C. Hernandez

Counsel:

Clare Lakewood, Hollin Kretzmann, Vera Pardee, for plaintiff and appellant Center for Biological Diversity.

Xavier Becerra, Attorney General, John A. Saurenman, Senior Assistant Attorney General, Jennifer W. Rosenfeld, Acting Supervising Deputy Attorney General, Baine P. Kerr, Deputy Attorney General for defendant and respondent California Department of Conservation, Division of Oil, Gas, and Geothermal Resources.

Gibson, Dunn & Crutcher LLP, Jeffrey D. Dintzer and Matthew C. Wickersham, for intervener and respondent Aera Energy LLC.

Pillsbury Winthrop Shaw Pittmann LLP, Margaret Rosegay, Norman F. Carlin and Blaine I. Green, for intervener and respondent Western States Petroleum Association et al.

A149896