Filed 2/25/25

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| SISKIYOU HOSPITAL, INC., | C097671, C098311 |
| Plaintiff and Appellant, | (Super. Ct. No. SCCV-CVPT-2019-1501) |
| v. | |
| COUNTY OF SISKIYOU et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Siskiyou County, Karen Dixon, Judge. Affirmed.

Athene Law, Long X. Do and Felicia Y. Sze for Plaintiff and Appellant.

Jacquelyn J. Garman for California Hospital Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Olson Remcho, Ariya Haghighat, Robin B. Johansen, and Margaret R. Prinzing for Defendants and Respondents County of Siskiyou and Sara Collard.

Jennifer Bacon Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents County of Siskiyou and Sara Collard.

1

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown, Supervising Deputy Attorney General, and Ricardo Enriquez, Deputy Attorney General for Defendants and Respondents California Department of Health Care Services and Michelle Baass.

This case involves a dispute between a hospital and a local government over how persons who present with symptoms of a psychiatric emergency medical condition are evaluated and treated in Siskiyou County.  In 1967, the Legislature enacted the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) (LPS Act or Act)[1] to govern the involuntary confinement of mentally disordered persons.  (Stats. 1967, ch. 1667, § 36; *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095.)  One of the purposes of the Act is to "provide prompt evaluation and treatment of persons with mental health disorders or impaired by chronic alcoholism."  (§ 5001, subd. (b).)  Section 5150 of the Act, the statute primarily at issue in this case, allows peace officers and certain medical professionals to take a person into custody for assessment, evaluation, and crisis intervention for up to 72 hours where there is probable cause to believe that the person is, as a result of a mental health disorder, a danger to others, or to themselves, or gravely disabled.  (§ 5150, subd. (a).)[2]  This practice is known as a "5150 hold" or "72-hour hold," and persons subject to such a hold (i.e., involuntary confinement) are referred to as "5150 patients" or "5150 detainees."

In this consolidated appeal, plaintiff Siskiyou Hospital, Inc., dba Fairchild Medical Center (Fairchild), challenges the order denying its motion for a preliminary injunction,

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  Alternatively, section 5150 allows peace officers and certain medical professionals to take a person subject to the statute into custody for a period of up to 72 hours for "placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services." (§ 5150, subd. (a).)

which sought an order prohibiting defendants County of Siskiyou and Sarah Collard, in her official capacity as director of the County's Health and Human Services Agency (collectively, the County), from taking any person to Fairchild's emergency department or "requesting and forcing" Fairchild's emergency department to "keep" the person pursuant to the LPS Act, when that person does not have a medical emergency condition having a "*physical*, organic cause." (Italics added.) In other words, Fairchild sought an order preventing the County from bringing any 5150 patient to its emergency department and requiring that person to be held there for up to 72 hours when they do not need *physical* emergency care but rather evaluation and treatment as a result of a mental health disorder. Fairchild also challenges the judgment of dismissal entered after the trial court sustained two separate demurrers to the operative complaint without leave to amend, which were filed by the County and defendants California Department of Health Care Services (DHCS) and Michelle Baass, in her official capacity as the director of the DHCS (collectively, the Department).

With one exception (breach of contract), the dismissed claims sought a traditional writ of mandate directing the County and/or the Department to comply with various laws (e.g., Medicaid laws, LPS Act) and their implementing regulations. Collectively, Fairchild's writ claims were predicated on the theory that the County had a mandatory legal duty to: (1) provide 5150 patients specialty mental health services (SMHS) (e.g., psychiatric care) while they are being held in Fairchild's emergency department pursuant to the LPS Act; (2) timely arrange for the transfer of section 5150 patients from Fairchild's emergency department to an appropriate psychiatric care facility after they are medically cleared of all physical emergency medical conditions and their medical condition is stabilized; and (3) reimburse Fairchild for the costs associated with caring for and holding 5150 patients in its emergency department.

As will appear, at the center of the parties' dispute is whether Fairchild is an appropriate facility to evaluate and treat 5150 patients in Siskiyou County. The parties

disagree as to whether Fairchild is a "designated facility" within the meaning of the LPS Act, such that Fairchild is the proper facility for the County to bring persons presenting with symptoms of a psychiatric emergency medical condition for a 5150 hold. Fairchild contends that because it is not licensed to provide acute-level psychiatric care, the County cannot lawfully bring persons to its emergency department who are suffering from a psychiatric emergency medical condition and insist that such patients be held there for up to 72 hours without receiving any SMHS for their condition.

For the reasons that follow, we affirm the judgment of dismissal entered after the trial court sustained the demurrers to the operative complaint without leave to amend, and dismiss as moot Fairchild's appeal from the order denying its motion for a preliminary injunction.

## BACKGROUND

This lawsuit implicates federal and state laws (as well as their implementing regulations) concerning how California provides health care to low-income persons, including those persons who present with symptoms of a psychiatric emergency medical condition. Accordingly, to provide important context, we briefly summarize the underlying law before detailing the pertinent facts and procedure.

### *Medicaid*

Medicaid is a joint federal and state program designed to aid states in providing health care to low-income persons. (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2023) 15 Cal.5th 1, 5 (*Family Health*); see *National Federation of Independent Business v. Sebelius* (2012) 567 U.S. 519, 541-542, 575 [describing the program].) In return for federal funding, participating states, including California, agree to reimburse health care providers for the costs of delivering care to enrolled program beneficiaries. (*Family Health*, at p. 5.) California participates in Medicaid through the program known as Medi-Cal. (*Id.* at p. 7; see *Allied Anesthesia Medical Group, Inc. v.*

4

*Inland Empire Health Plan* (2022) 80 Cal.App.5th 794, 802-804 [describing Medicaid and Medi-Cal law].)

"To qualify for federal funds, participating states submit a 'state plan' to the federal government. [Citation.] 'The State plan is a comprehensive written statement submitted by the [state] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity' with federal law." (*Santa Rosa Memorial Hospital, Inc. v. Kent* (2018) 25 Cal.App.5th 811, 815.) "California's Medi-Cal program implements the federal Medicaid Act. [Citations.] The [DHCS] is [the state agency] charged with administering Medi-Cal in accordance with the state plan, applicable Welfare and Institutions Code provisions, and Medi-Cal regulations." (*Id.* at pp. 815-816.)

"Medi-Cal is intended to provide, to the extent practicable, medically necessary care to California residents 'who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security.' [Citation.] Under Medi-Cal, beneficiaries may receive a broad range of services, including physician and hospital services, optometry, mental health care, and prescription medications." (*Marquez v. State Dept. of Health Care Services* (2015) 240 Cal.App.4th 87, 94 (*Marquez*).)

"The Medi-Cal program does not directly provide services; instead, it reimburses participating health care plans and providers for covered services provided to Medi-Cal beneficiaries. [Citation.] Medi-Cal accomplishes this on a fee-for-service basis or a managed care basis." (*Marquez, supra,* 240 Cal.App.4th at p. 94.)

Under the managed care system, the DHCS contracts with managed care plans to "provide health coverage to Medi-Cal beneficiaries, and the plans are paid a predetermined amount for each beneficiary per month, whether or not the beneficiary actually receives services. [Citations.] The beneficiary then obtains medical services

5

from a provider within the managed care plan's network." (*Marquez, supra,* 240 Cal.App.4th at p. 94.)  By contrast, under the fee-for-service system, "health care practitioners are reimbursed for each covered service they provide.  The beneficiary can obtain care from any provider that participates in Medi-Cal, is willing to treat the beneficiary, and is willing to accept reimbursement from DHCS at a set amount for the services provided." (*Ibid.*)

*Emergency Medical Care for Low-Income and Uninsured Persons*

The Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA) (42 U.S.C. § 1395dd et seq.), commonly known as the "Patient Anti-Dumping Act," was enacted by Congress to ensure that low-income and uninsured persons receive emergency medical care.  (See *Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 109 & fn. 2; *Baker v. Adventist Health, Inc.* (9th Cir. 2001) 260 F.3d 987, 993 [EMTALA was enacted "to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment"]; *Jackson v. East Bay Hospital* (9th Cir. 2001) 246 F.3d 1248, 1254, 1260 [EMTALA was enacted in response to concerns "about the increasing number of reports that hospital emergency rooms are refusing to treat patients with emergency conditions if the patient does not have medical insurance"]; *Arrington v. Wong* (9th Cir. 2001) 237 F.3d 1066, 1069 [the purpose of EMTALA is to prevent hospitals from "dumping" indigent patients by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized].)

Under EMTALA and related California law, a hospital with an emergency department must, without regard to insurance or ability to pay, provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to any individual who comes to the department and requests examination or treatment for a medical condition.  If the hospital detects an "emergency medical condition," it must provide such treatment as may be required to "stabilize" the condition

6

or transfer the individual to another medical facility. (*Barris v. County of Los Angeles, supra*, 20 Cal.4th at p. 109; see 42 U.S.C. § 1395dd, subds. (a), (b); Health & Saf. Code, §§ 1317, subds. (a), (b) & (j), 1317.1, subd. (a); *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1266.)[3] Further, as a general matter, a hospital may not transfer or discharge a patient until it has been determined that the patient's emergency medical condition has been "stabilized."[4] (*Barris*, at p. 109; see 42 U.S.C § 1395dd, subds. (c), (e)(3); see Health & Saf. Code, §§ 1317.1, subd. (j), 1317.2; *Children's Hospital Central California v. Blue Cross of California*, *supra*, 226 Cal.App.4th at p. 1266.) As relevant here, to "stabilize" a patient means "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." (42 U.S.C. § 1395dd, subd. (e)(3)(A); see Health & Saf. Code, § 1317.1, subd. (j) [providing a similar definition as to when a patient is considered "stabilized"]; 42 U.S.C. § 1395dd, subd. (e)(3)(B) [defining the term "stabilized" to mean (in relevant part) "that no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility"].)

---

[3] Health and Safety Code section 1317 is California's version of EMTALA. (*Brooker v. Desert Hospital Corp*. (9th Cir. 1991) 947 F.2d 412, 415.)

[4] Under EMTALA, if an individual's emergency medical condition has not been stabilized, a hospital may not transfer the individual unless, among other things, the transfer is an "appropriate transfer," which requires the receiving facility to (1) have available space and qualified personnel to treat the individual, and (2) agree to accept the transfer and provide appropriate medical treatment. (42 U.S.C. § 1395dd, subd. (c)(2)(B).)

7

EMTALA defines the term "emergency medical condition" to mean, in pertinent part, "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-- [¶] (i) placing the health of the individual . . . in serious jeopardy, [¶] (ii) serious impairment to bodily functions, or [¶] (iii) serious dysfunction of any bodily organ or part." (42 U.S.C. § 1395dd, subd. (e)(1); see Health & Saf. Code, § 1317.1, subd. (b) [providing a similar definition of "emergency medical condition"].) An emergency medical condition within the meaning of EMTALA includes a "psychiatric disturbance." (*Thomas v. Christ Hospital and Medical Center* (7th Cir. 2003) 328 F.3d 890, 893-894; 42 C.F.R. § 489.24, subd. (b).)

Likewise, under California law, an emergency medical condition includes a psychiatric medical condition. (See Health & Saf. Code, § 1317.1, subd. (a)(2)(A) [defining "emergency services and care" to include medical "screening, examination, and evaluation by a physician . . . to determine if a *psychiatric emergency medical condition* exists, and the care and treatment necessary to relieve or eliminate the psychiatric emergency medical condition, within the capability of the facility" (italics added)].) California defines the term "psychiatric emergency medical condition" to mean "a mental health disorder that manifests itself by acute symptoms of sufficient severity that it renders the patient as being either of the following:" "(A) An immediate danger to themselves or to others. [¶] (B) Immediately unable to provide for, or utilize, food, shelter, or clothing, due to the mental health disorder." (*Id.,* subd. (k)(1).)

*LPS Act*

As previously indicated, the LPS Act governs the involuntary confinement of mentally disordered persons in California. (*Conservatorship of Eric B., supra,* 12 Cal.5th at p. 1095.) One of the purposes of the Act is to provide "prompt evaluation and treatment of persons with mental health disorders or impaired by chronic alcoholism." (§ 5001, subd. (b).) This purpose "reflects the unfortunate reality that mental illness in its

8

most acute form can pose a danger to the individuals themselves or others that requires immediate attention. To achieve this purpose, a number of [the] Act['s] provisions allow a person to be removed from the general population in order to be civilly committed based on a probable cause determination made by a mental health or law enforcement professional, and then to challenge the civil commitment within a reasonable time afterwards." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253-254.)

Section 5150 of the LPS Act authorizes the involuntary confinement of persons suffering from a mental health disorder. In full, the statute provides: "When a person, as a result of a mental health disorder, is a danger to others, or to themselves, or gravely disabled, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff, as defined by regulation, of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county[5] may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services. The 72-hour period begins at the time when the person is first detained. At a minimum, assessment, as defined in Section 5150.4, and evaluation, as defined in subdivision (a) of Section 5008, shall be conducted and provided on an ongoing basis. Crisis intervention, as defined in

---

**5** The LPS Act authorizes a "professional person designated by the county" to assess a 5150 patient "to determine whether [the patient] can be properly served without being detained," and if that "professional person" determines the patient "can be properly served without being detained," the patient must be "provided evaluation, crisis intervention, or other inpatient or outpatient services on a voluntary basis." (§ 5150, subd. (c).)

subdivision (e) of Section 5008, may be provided concurrently with assessment, evaluation, or any other service." (§ 5150, subd. (a), fn. added.)[6]

At the time of the rulings challenged on appeal, the LPS Act defined " 'designated facility' " to mean "a facility that is licensed or certified as a mental health treatment facility or a *hospital*, as defined in subdivision (a) or (b) of Section 1250 of the Health and Safety Code, by the State Department of Public Health" (former § 5008, subd. (n), italics added), which included a general acute care hospital. (See Health & Saf. Code, § 1250, subd. (a) [defining the term "general acute care hospital"].)[7]

*Factual Background*[8]

Fairchild is a nonprofit public benefit corporation licensed by the California Department of Public Health to operate a 25-bed general acute care hospital in Yreka. It is one of two hospitals in rural Siskiyou County with the capability of providing the

---

[6] The LPS Act defines "crisis intervention" as follows: "[A]n interview or series of interviews within a brief period of time, conducted by qualified professionals, and designed to alleviate personal or family situations that present a serious and imminent threat to the health or stability of the person or the family. The interview or interviews may be conducted in the home of the person or family, or on an inpatient or outpatient basis with such therapy, or other services, as may be appropriate. The interview or interviews may include family members, significant support persons, providers, or other entities or individuals, as appropriate and as authorized by law. Crisis intervention may, as appropriate, include suicide prevention, psychiatric, welfare, psychological, legal, or other social services." (§ 5008, subd. (e).)

[7] Effective January 1, 2025, subdivision (n) of section 5008 was amended. (Stats. 2024, ch. 644, § 5.) The relevant amendments are discussed *post* at footnote 15.

[8] To provide important context, the facts in this section are not limited to the allegations asserted in the operative complaint. Some of the facts are taken from the evidence submitted in connection with Fairchild's motion for a preliminary injunction. We remain mindful that in reviewing the propriety of the order sustaining the demurrers, our analysis is limited to determining whether the operative complaint states a viable claim for relief based on the properly pleaded facts, as well as those facts subject to judicial notice. (*Howard Jarvis Taxpayers Ass'n. v. City of La Habra* (2001) 25 Cal.4th 809, 814.)

10

medical clearance necessary for 5150 patients to be transferred to a psychiatric facility, with the other hospital located approximately 37 miles away. Fairchild is open 24 hours a day, seven days a week. Although Fairchild has an emergency department that provides emergency medical services to the public, it does not provide any acute-level psychiatric care or other mental health care services. Nor does the other hospital in Siskiyou County.

The County--through its law enforcement agencies, county jail staff, or Behavioral Health Division's Psychiatric Emergency Team (PET)--regularly brings persons (approximately 200-300 per year) to Fairchild's emergency department, the vast majority of whom are indigent Medi-Cal beneficiaries. These persons (i.e., 5150 patients or 5150 detainees) present with acute abnormal behavior and require evaluation and possible medical treatment. Some of the 5150 detainees are placed on a 5150 hold prior to arriving at Fairchild's emergency department, while others have a 5150 hold placed on them after they have been screened and medically cleared by Fairchild's emergency department.

As noted *ante*, under the federally funded Medicaid health care program, California receives funds to pay for the costs of medical services provided to low-income individuals and/or enrollees in its Medicaid program--Medi-Cal, which is administered and enforced by DHCS. (*Family Health*, *supra*, 15 Cal.5th at pp. 5, 7.) Here, Fairchild alleges that Siskiyou County, pursuant to a contract with the DHCS, "acts as the mental health plan for Medi-Cal beneficiaries" residing in the county, which includes SMHS (e.g., emergency services, poststabilization services, psychiatric services). Under California law, the County's mental health plan for Medi-Cal beneficiaries must make SMHS available 24 hours a day, seven days a week, to treat a beneficiary's urgent condition. (Cal. Code Regs., tit. 9, § 1810.405, subds. (a), (c).)

When a 5150 patient is brought to Fairchild's emergency department, they are triaged by the nursing staff and given a full medical examination by a physician,

11

including lab work. The treating physician relies on the lab work and a medical examination to determine whether there is any organic, physical (as opposed to mental health) basis for the acute abnormal behavior exhibited by the patient. When the treating physician determines that a 5150 patient's abnormal behavior is not rooted in an organic, physical cause, the physician can "medically clear" the patient for transfer to an appropriate facility. Inpatient psychiatric facilities, to which a significant portion of Fairchild's 5150 patients are eventually transferred, will not accept a 5150 patient until they have been medically cleared.

After a 5150 patient has been medically cleared (which includes stabilizing any emergency medical condition), Fairchild notifies the County and requests that the patient be immediately transferred to an appropriate facility to receive SMHS. In response, the County's PET sends a crisis worker or behavioral health specialist to Fairchild's emergency department to evaluate the patient and review lab results. This person, under the supervision of a licensed clinical supervisor, provides treatment to the 5150 patient as necessary during the evaluation process (including crisis intervention services), and then decides whether to impose a 5150 hold or to maintain a previously placed hold. If the crisis worker or behavioral health specialist decides to place or maintain a 5150 hold, they instruct the emergency department to maintain the 5150 patient until the PET can arrange for a transfer of the patient to another facility for mental health care services (e.g., an inpatient psychiatric facility).

During the waiting period, the PET requires Fairchild's emergency department to feed the 5150 patient, keep them medically stable, and provide security or monitoring to ensure they do not hurt themselves or others. While some medically cleared 5150 patients have been held in Fairchild's emergency department for several weeks while they await transfer to a psychiatric facility, most of the patients are discharged or transferred much sooner. From 2019 through the first quarter of 2022, the average length

of stay for a 5150 patient in Fairchild's emergency department was approximately 13 hours.

*Procedural Background*

*Commencement of the Instant Action*

In December 2019, Fairchild filed suit against the County and others in Siskiyou County Superior Court, alleging a civil rights claim under 42 U.S.C. section 1983 and several claims for a traditional writ of mandate under section 1085 of the Code of Civil Procedure (e.g., writ claim seeking to compel compliance with Medicaid laws).[9] As explained more fully below, Fairchild brought this action because the County rejected its request to stop "secluding" 5150 patients in its emergency department for unduly lengthy periods of time without any access to medically necessary SMHS.

*Removal to Federal Court*

In March 2020, the matter was removed to federal court based on federal question jurisdiction. Thereafter, Fairchild filed a first amended verified complaint and petition for writ of mandate, and a motion for a preliminary injunction.

*Dismissal of Federal Claims and Remand to State Court*

In January 2022, after the DCHS filed a motion to dismiss and the County filed a motion for judgment on the pleadings, the federal district court dismissed Fairchild's federal claims for lack of standing, declined to exercise supplemental jurisdiction over the remaining state law claims, denied Fairchild's motion for preliminary injunction as moot, and remanded the matter back to the Siskiyou County Superior Court.

*Motion for Preliminary Injunction*

In July 2022, Fairchild filed a second motion for preliminary injunction in state court, which sought an order prohibiting the County from "bringing" any individual to

---

[9] Because the original complaint is not part of the appellate record, we rely on the parties' representations as to the claims alleged therein.

Fairchild's emergency department or "requesting and forcing" Fairchild's emergency department to "keep" or hold such individual pursuant to the LPS Act, when such individual does not have a medical emergency condition having a "*physical*, organic cause."[10] In seeking such relief, Fairchild claimed: "Nothing by such a preliminary injunction would prevent anyone from accessing Fairchild's [emergency department] services within the hospital's staffing capabilities and within the scope of its state license."

In support of its motion, Fairchild explained that it sought injunctive relief to "protect and preserve [its emergency department's] de facto role as the primary, if not sole, source of reliable and safe health care in Siskiyou County." According to Fairchild, because its emergency department was not capable or licensed to provide the acute-level psychiatric care and other behavioral health services that 5150 patients need (e.g., SMHS,) the County's practice of detaining individuals under the LPS Act (i.e., placing 5150 holds) was "severely and needlessly burdening" Fairchild's emergency department. Fairchild insisted that a preliminary injunction was warranted to temporarily stop the County from transporting 5150 patients to, and "secluding" them in, its emergency department when those patients do not need physical emergency care and cannot receive necessary mental health services (e.g., SMHS) until they are transferred to another facility (e.g., inpatient psychiatric facility). In Fairchild's view, injunctive relief was proper because it "would significantly curtail the ongoing severe harms caused by 5150 [patients] on [its emergency department's] ability to provide vital and safe health care services to the Siskiyou community."

As for the merits, Fairchild argued that it was highly likely to succeed because the County was "blatantly flouting the carefully designed due process protections and public

---

[10] Fairchild did not seek injunctive relief against the Department.

14

policy goals underlying the LPS Act." According to Fairchild, because it was "not a designated psychiatric care facility" approved to receive and treat 5150 patients (by providing the mental health services required under the LPS Act), the County could not "legally" bring 5150 patients to its emergency department or insist that such persons be kept there without providing them any of the mental health care services mandated by the LPS Act. Fairchild added that "most" of the 5150 patients brought to its emergency department are Medi-Cal beneficiaries, "to which the County owes broad obligations to ensure *reasonably prompt access* to [SMHS]." (Italics added.) In Fairchild's view, the County's practice of "secluding" 5150 patients in its emergency department without arranging for the provision of mental health care services was depriving these persons of their rights to medically necessary psychiatric care. Fairchild insisted that the County was violating the LPS Act by "forcing" Fairchild's emergency department to hold 5150 patients after they have been "medically cleared" without "providing any mandated mental health services."

As for harm, Fairchild claimed it had and would continue to suffer great irreparable harm in the absence of injunctive relief. In support of its position, Fairchild explained that "receiving, screening, treating, and secluding" 5150 patients in its emergency department had resulted in "significant deterioration of the [emergency department's] ability to care for patients and the quality of care that [was] provided." Fairchild further explained that the "unsettling and often violent behavior" of 5150 patients "severely impede[d]" emergency department operations and "threaten[ed] patient and staff safety," and that the health and well-being of the 5150 patients was harmed when they were "secluded" for lengthy periods of time without receiving "any medically necessary psychiatric care."

Finally, Fairchild argued the public interest and balance of hardships tipped "sharply" in favor of injunctive relief. In making this argument, Fairchild explained: "[T]here is tremendous hardship on [Fairchild's emergency department] when it is forced

by the County to receive and seclude 5150 [patients]. Not only are [emergency department] physicians and staff negatively impacted, [other] patients who come to the [emergency department] also suffer consequences from encountering unsettling behaviors exhibited by the County's 5150 [patients]. A preliminary injunction in these circumstances serves the public interest in preserving access to health care to a remote region of the State." Fairchild added that injunctive relief would also address the harms to 5150 patients, who do not receive any medically needed SMHS while being held in its emergency department. According to Fairchild, because it cannot provide any SMHS, keeping or holding 5150 patients in its emergency department was "tantamount to an absolute deprivation of needed medical care to these individuals." Fairchild maintained that the County would suffer minimal, if any, hardship from the requested injunctive relief, since there was no public interest that would be preserved or protected by not issuing such relief. In support of its position, Fairchild noted that the 5150 patients held in its emergency department were already in the County's custody, some of whom were moved from the County's jail system where they received housing, shelter, food, and secured monitoring. Fairchild opined that the County was "better equipped" than Fairchild to "keep" 5150 patients pending their transfer to an inpatient psychiatric facility.

In response, the County argued Fairchild had failed to demonstrate that this is an "extreme case" justifying the imposition of a pretrial mandatory injunction. Among other things, the County claimed that Fairchild's attempt to "bar certain patients from its emergency department" would violate federal law (e.g., EMTALA), and that Fairchild had failed to cite any authority in support of its "novel theory" that the County could not bring 5150 patients to Fairchild's emergency department because Fairchild was not a "designated facility" within the meaning of the LPS Act. The County further argued that, contrary to Fairchild's contention, it does in fact provide mental health treatment to 5150 patients while they are being held at Fairchild, and that the balance of harms required the

16

denial of injunctive relief, as the requested injunction could deprive 5150 patients of potentially life-saving medical care and would add to the delays Fairchild claimed were already too long. As for the duty to provide mental health care services, the County maintained that "Medicaid law" did *not* require it to *immediately* provide 5150 patients such services. Rather, those services must be provided with "reasonable promptness."

*Operative Complaint*

In August 2022, Fairchild filed a second amended verified complaint and petition for writ of mandate against the County and the Department. This pleading (the operative complaint) alleged six causes of action, five of which sought a traditional writ of mandate compelling compliance with the LPS Act and other laws (e.g., Medicaid laws).

As for the LPS Act, Fairchild sought an order compelling the County to fully comply with the Act, which included, but was not limited to: (1) "Transporting and keeping 5150 patients in the County's custody only to county-designated and DHCS-approved mental health facilities consistent with the LPS Act; and transporting and secluding such patients to Fairchild only for purposes of addressing emergency medical conditions within Fairchild's capabilities and scope of its licensure"; (2) "For the entire duration that 5150 patients are at Fairchild's facilities, provide, arrange, and/or pay for security (including 24-hour security when necessary) and all other related services to house, feed, and protect the 5150 patients from harming themselves; to ensure the 5150 patients do not disrupt Fairchild's operation of its hospital or needlessly drain the hospital's staff and resources; and to protect Fairchild staff and patients . . . ."; (3) "Promptly transferring 5150 patients after Fairchild has medically cleared them of all physical emergency medical conditions and determined that a transfer is safe and appropriate"; (4) To the extent it is not possible to transfer 5150 patients from Fairchild after they are medically cleared of all physical emergency medical conditions, provide for, arrange, and/or pay for all mental health services and evaluations required under the

17

LPS Act"; and (5) "Reimbursing Fairchild for services and costs rendered to 5150 patients."

*Demurrers*

In October 2022, the County demurred to the operative complaint,[11] arguing that it was subject to dismissal because Fairchild sought relief prohibited by law (writ of mandate) and/or because Fairchild had failed to state an actionable claim for relief. Among other things, the County asserted that Fairchild could not identify any legal authority supporting its writ claims, including any authority supporting its theory that the County had a legal duty to provide mental health treatment in a different manner than it does (e.g., more prompt or faster care). For example, the County argued the operative complaint did not include allegations establishing a clear legal mandate requiring it to provide mental health treatment to 5150 patients while they were being held in Fairchild's emergency department pursuant to the LPS Act. The County maintained that such treatment can properly be provided to 5150 patients after they are transferred from Fairchild's emergency department to an inpatient psychiatric facility.

The Department also demurred to the operative complaint,[12] arguing that the three writ claims alleged against it (i.e., the first, second, and third claims) were subject to dismissal. Among other things, the Department argued that the first and third claims failed as a matter of law because the Medicaid laws do not provide for a private right of action, and the second claim failed as a matter of law because Fairchild lacked standing to bring it.[13] Additionally, the Department asserted that all three claims failed to state an

---

[11] The Department filed a joinder to the County's demurrer.

[12] The County filed a joinder to the Department's demurrer.

[13] We recognize that the County and the Department alternatively moved to strike portions of the operative complaint. However, because the trial court sustained both of

18

actionable claim for relief because Fairchild did not identify any ministerial duty (i.e., clear legal mandate) that was violated by the Department or the County.

Fairchild opposed the demurrers, insisting that the operative complaint sufficiently stated cognizable claims for relief.

*Trial Court's Ruling on Motion for Preliminary Injunction*

In November 2022, after the submission of supplemental briefing and a hearing, the trial court denied Fairchild's motion for a preliminary injunction. In so ruling, the court found that Fairchild had failed to demonstrate that it was likely or very likely to prevail on the merits of its claims, and that the "burden" to the County in granting the motion would be "much greater" than the "burden" on Fairchild in denying the motion. The court explained that it was "very concerned" that the "population of people . . . subject to a 5150, 72 hour hold" would be "endangered by the granting of the [requested] injunction," and that if an injunction were issued, the other hospital in Siskiyou County would seek the same relief based on the same criteria, which would "put an even greater strain" on persons subject to a 5150 hold in Siskiyou County.

*Trial Court's Ruling on the Demurrers and Judgment of Dismissal*

In February 2023, after a hearing, the trial court sustained both demurrers without leave to amend. In doing so, the court found that Fairchild's claims were subject to dismissal for a variety of reasons. As for the writ claims, the court concluded that several of the claims improperly sought an order compelling the exercise of a discretionary act, that Fairchild lacked standing to compel compliance with certain state disability discrimination laws, and that there is no private right of action to enforce the Medicaid Act.

---

their respective demurrers without leave to amend, we need not and do not discuss the alternative relief sought by the motions to strike.

19

In March 2023, a judgment of dismissal was entered against Fairchild and in favor of the County and the Department.

*Appeals and Consolidation Order*

In December 2022, Fairchild timely appealed from the order denying its motion for a preliminary injunction. In April 2023, Fairchild timely appealed from the judgment of dismissal entered after the trial court sustained the demurrers without leave to amend. In May 2023, we granted the County's motion to consolidate the appeals for all appellate procedures, including argument and disposition. The case was fully briefed in September 2024 and the case was assigned to the current panel at the end of that month. We permitted the filing of two amicus briefs in October 2024 and considered those briefs as well as the responses thereto filed by the parties.

## DISCUSSION

As we next explain, we conclude the trial court properly sustained the demurrers to the operative complaint without leave to amend. As a consequence, we will affirm the judgment of dismissal entered against Fairchild, and dismiss as moot Fairchild's appeal from the denial of its motion for a preliminary injunction, as there is no remaining viable cause of action to support injunctive relief.

I

*Demurrers*

Fairchild argues the trial court erred in sustaining the demurrers to the operative complaint without leave to amend.

A. *Applicable Standards of Review*

1. *Traditional Writ of Mandate*

"Code of Civil Procedure section 1085, providing for [traditional] writs of mandate, is available to compel public agencies to perform acts required by law. [Citation.] To obtain relief, a petitioner must demonstrate (1) no 'plain, speedy, and adequate' alternative remedy exists [citation]; (2) 'a clear, present, . . . ministerial duty on

20

the part of the respondent'; and (3) a correlative 'clear, present, and beneficial right in the petitioner to the performance of that duty.' " (*People v. Picklesimer* (2010) 48 Cal.4th 330, 339-340 (*Picklesimer*); see Code Civ. Proc., § 1085, subd. (a) [a traditional writ of mandate may be issued "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station"]; *California Assn. of Professional Scientists v. Department of Finance* (2011) 195 Cal.App.4th 1228, 1236 (*Professional Scientists*) [to obtain writ relief, the petitioner must establish the existence of a public officer's or a public entity's "clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty"].)

A ministerial duty is an act that a public agency or officer is required to perform in a prescribed manner in obedience to the mandate of legal authority without regard to any personal judgment concerning the propriety of the act. (*Picklesimer,* supra, 48 Cal.4th at p. 340; *Kavanaugh v. West Sonoma County Union High School Dist*. (2003) 29 Cal.4th 911, 916.) " 'In order to construe a statute as imposing a mandatory duty, the mandatory nature of the duty must be phrased in explicit and forceful language.' " (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 914; see *Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1186 [a duty is ministerial when the action is " 'unqualifiedly required' "]; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267 [" '[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion' "].) " 'It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some *specific* statutory mandate that was violated by the [public entity] . . . .' [Citation.] Thus, 'the enactment at issue [must] be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken.' [Citation.] In addition, the enactment allegedly creating the mandatory duty must impose a duty on

21

the specific public entity sought to be held liable." (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 689; see *Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 780 [" 'Even if mandatory language appears in the statute creating a duty, the duty is discretionary if the [entity] must exercise significant discretion to perform the duty.' "].)

When a writ petition seeks an order requiring a public entity or its officers to act, the crucial issue is often whether the act that the petitioner seeks to compel is a *mandatory and ministerial duty*, or, on the contrary, is a *quasi-legislative and discretionary* act. (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 279.) " ' " '[I]n most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference. This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court.' " ' " (*Ibid.*)

In reviewing a trial court's judgment on a petition for a traditional writ of mandate, we independently review the petition to determine whether the appellant has stated a viable cause of action for mandamus relief. (*Center for Biological Diversity v. Department of Conservation* (2018) 26 Cal.App.5th 161, 171.)

2. *Demurrer*

A demurrer tests the legal sufficiency of the factual allegations in a complaint and/or petition for writ of mandate. (*SJJC Aviation Services, LLC v. City of San Jose* (2017) 12 Cal.App.5th 1043, 1051-1052.) On appeal from a judgment of dismissal based on an order sustaining a demurrer, we apply a de novo standard of review; we exercise our independent judgment about whether the pleading sufficiently states a viable cause of action under any legal theory. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *Dilbert v. Newsom* (2024) 101 Cal.App.5th 317, 322.) We also review

questions of statutory interpretation de novo.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.)

In determining whether a demurrer was properly sustained, we accept as true "all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th at p. 814.) However, we do not assume the truth of contentions, deductions, or conclusions of fact or law.  (*Yvanova v. New Century Mortgage Corp*. (2016) 62 Cal.4th 919, 924.)  We read the challenged pleading as a whole and its parts in their context to give the pleading a reasonable interpretation.  (*Evans v. Berkeley* (2009) 38 Cal.4th 1, 6.)  " ' "We affirm [the judgment] if any ground offered in support of the demurrer was well taken. . . .  We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." ' "  (*Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911, 924.)

When a trial court has sustained a demurrer without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; see also *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  Such a showing can be made for the first time on appeal.  (*Smith v. State Farm Mutual Automobile Ins. Co*. (2001) 93 Cal.App.4th 700, 711.)  "The plaintiff has the burden of proving that an amendment would cure the defect."  (*Schifando,* at p. 1081; *Blank*, at p. 318.)

B.  *Appellate Rules of Procedure*

"[A] fundamental principle of appellate procedure [is] that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment.  [Citations.]  'This is not only a general principle

of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

Each argument made in an appellate brief must be "under a separate heading or subheading summarizing the point," and each point must be supported "by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)[14] The obligation to support points with argument and citations to authority requires more than simply stating a bare assertion that the challenged judgment or order is erroneous and leaving it to the appellate court to figure out why. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.) A conclusory assertion of legal error, without citation and application of pertinent authority, results in forfeiture of the claim. (*St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301, 313; see *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 523 ["[c]onclusory assertions of error are ineffective in raising issues on appeal"].) Indeed, it is well settled that an appellate court is not bound to develop an appellant's arguments for him or construct theories or arguments that would undermine the judgment. Nor are we required to examine undeveloped claims. The absence of reasoned legal argument supported by citation to authority allows this court to treat the contention as forfeited. (See *County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)

C. *Analysis*

As we shall explain, Fairchild makes several undeveloped arguments that we deem forfeited. We also reject Fairchild's claims of error on the merits.

---

[14] All further rule references are to the California Rules of Court.

### 1. *Medicaid Laws*

Fairchild's first cause of action, asserted against both the County and the Department, sought a writ of mandate compelling compliance with various state and federal Medicaid laws and regulations. In support of this claim, Fairchild alleged that the County failed to comply with certain rules governing how 5150 patients enrolled in Medi-Cal must be treated for mental health conditions, and that the Department failed to ensure the County complied with these rules. According to the operative complaint, the County violated the Medicaid Act and California regulations implementing the Medicaid Act by failing to provide 5150 patients enrolled in Medi-Cal with the following: (1) medical care and services with "reasonable promptness;" (2) "timely" emergency care and poststabilization services for psychiatric and mental health conditions; and (3) "meaningful access" to SMHS 24 hours a day, seven days a week. The operative complaint further alleged that, with respect to 5150 patients, the County failed to: (1) arrange for "appropriate" management of a Medi-Cal beneficiary's care with necessary SMHS providers; (2) maintain an "adequate" network of providers who could provide "meaningful access" to covered services; and (3) maintain "timely" out-of-network coverage of covered services. As a consequence of the foregoing actions or inactions, Fairchild asserted that 5150 patients in Siskiyou County were "forced to be secluded in Fairchild's emergency department for unacceptably lengthy periods of time without any SMHS and other necessary related care to address their psychiatric and mental health conditions."

Fairchild argues reversal is required because the operative complaint sufficiently alleged the County failed to arrange for or provide 5150 patients any of the medically necessary SMHS the Medicaid laws mandate be provided in a *reasonably prompt* manner, including while 5150 patients were being held in Fairchild's emergency department pursuant to the LPS Act. In making this argument, Fairchild does not cite any authority or provide reasoned legal analysis explaining how and why the trial court

25

committed reversible error in determining that the operative complaint failed to identify a specific statutory mandate (i.e., ministerial duty) that was violated by the County or the Department. Fairchild's conclusory assertion of legal error, without citation and application of pertinent authority, results in forfeiture of its claim. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand*).)

Forfeiture aside, we see no basis for reversal. In its appellate briefing, Fairchild has not pinpointed any clear ministerial duty that was violated or could be remedied by the issuance of a writ of mandate. As previously indicated, a ministerial duty is an act that a public agency or officer is required to perform in a prescribed manner in obedience to the mandate of legal authority without regard to any personal judgment concerning the propriety of the act. (*Picklesimer*, *supra*, 48 Cal.4th at pp. 339-340; *Kavanaugh v. West Sonoma County Union High School Dist*., *supra,* 29 Cal.4th at p. 916.) Having independently reviewed the Medicaid laws cited in the operative complaint, we discern no basis for mandamus relief. Fairchild's first cause of action is largely predicated on the County's failure to: (1) timely provide or arrange SMHS (e.g., psychiatric care) for 5150 patients brought to Fairchild's emergency department; and (2) timely arrange for the transfer of 5150 patients to an appropriate "psychiatric care provider" after Fairchild's emergency department medically clears them of all physical emergency medical conditions and determines that a transfer is safe and appropriate.

As the trial court correctly observed, none of the statutes or regulations identified in the operative complaint include a mandatory and ministerial duty requiring the County or the Department to affirmatively act in a certain way upon learning of the facts alleged in the operative complaint. For example, Fairchild cites 42 U.S.C. section 1396a of the Medicaid Act, which (as relevant here) requires that all medical assistance (e.g., care and services) under a state plan for medical assistance (e.g., Medi-Cal) be furnished with "reasonable promptness to all eligible individuals." (42 U.S.C. § 1396a, subd. (a)(8), (10).) However, nothing in the text of that provision establishes the existence of an

26

obligation on the part of the County or the Department to perform a specific, nondiscretionary act in a particular way. There is no clear legal mandate requiring the County or the Department to act at any particular moment or within any specific time period. Likewise, there is no clear legal mandate requiring the County or the Department to affirmatively act in any specific way with respect to the other laws and regulations identified in the operative complaint.

In short, the operative complaint does not state a viable claim for a traditional writ of mandate. Even accepting as true the allegations in the operative complaint, they do not demonstrate that the County or the Department failed to act in the face of a nondiscretionary duty imposed by law. It is well-settled that a traditional writ of mandate will only lie where there is a ministerial duty capable of direct enforcement. (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.) Accordingly, the trial court properly sustained the demurrers to the first cause of action.

### 2. *Disability Discrimination Laws*

Fairchild's second cause of action, asserted against both the County and the Department, sought a writ of mandate compelling compliance with certain state and federal disability discrimination laws. In support of this claim, Fairchild alleged that all Medi-Cal and indigent patients (including 5150 patients) in Siskiyou County are discriminated against on the basis of mental disability because the County and the DHCS fail to ensure that they have "equal access" to all covered health care services (e.g., SMHS), and that the Department failed to ensure that the County implemented its mental health plan in accordance with the nondiscrimination laws. According to the operative complaint, Medi-Cal and indigent patients seeking medical care at Fairchild "face long waits to access emergency care for their mental health conditions that patients with physical health conditions do not face" as a result of the "manner in which the County and DHCS have implemented the provision of SMHS." The operative complaint further alleged that the DHCS has "established payment rates for acute psychiatric hospital

27

services in a manner completely different than reimbursement for physical health services rendered by hospitals," which had resulted in "rates for psychiatric hospital services per diem [that] are less than half the rates available for physical health hospital services per diem."

The operative complaint also alleged: "The 5150 patients are otherwise qualified individuals with a disability (a mental health condition) but, solely by reason of the disability, were excluded from the full participation in, and denied the benefits of, the Medi-Cal program and the County's indigent programs. If the 5150 patients' emergency condition arose out of physical conditions, rather than mental health conditions, they would have had immediate access to treatment. Furthermore, on the basis of mental disability, the County has: a) denied the 5150 patients and other eligible individuals the opportunity to participate in or benefit from Medi-Cal-covered health care services: b) failed to afford these patients with mental disabilities an opportunity to receive emergency services that is equal to patients without mental disabilities; c) failed to provide these patients with mental disabilities with coverage for mental health conditions that is as effective as the coverage for physical health conditions; d) limited the Medi-Cal benefits available to persons with mental health conditions; and e) imposed additional restrictions on mental health benefits not imposed on physical health benefits. Such disparate treatment by the County amounts to discrimination on the basis of disability in violation of section 504 of the Rehabilitation Act, the ADA [i.e., The Americans with Disabilities Act] (including the ADA's integration mandate), and Welfare and Institutions Code section 11135."

Fairchild argues reversal is required because the operative complaint sufficiently stated violations of "anti-disability discrimination laws," since it includes allegations establishing that "the County gives unfavorable treatment to Medi-Cal beneficiaries who require SMHS as compared to beneficiaries who need physical health care services," and that the Department failed to guard against such violations and "established a Medi-Cal

28

reimbursement system that contributed to the disparate treatment." In making this argument, Fairchild claims the trial court erred in determining that this claim failed as a matter of law because Fairchild lacked standing to assert it.

Preliminarily, we note that Fairchild does not cite any authority or provide reasoned legal analysis explaining how and why the trial court committed reversible error. Fairchild's conclusory assertion of legal error, without citation and application of pertinent authority, results in forfeiture of its claim. (*United Grand, supra,* 36 Cal.App.5th at p. 153.) In any event, we conclude that Fairchild's second cause of action was properly dismissed. As the Department and the County argued in the trial court, the operative complaint does not state an actionable claim for mandamus relief. Fairchild failed to identify any clear legal mandate requiring the County or the Department to affirmatively act in any particular way upon learning of the facts alleged in the operative complaint. On appeal, Fairchild has not directed us to any specific statutory language imposing a mandatory and ministerial duty in explicit and forceful language. And nothing in the operative complaint establishes the existence of such a duty--that is, an obligation on the part of the County or the Department to perform a specific, nondiscretionary act in a certain way. As we have noted, a traditional writ of mandate will only lie where there is a ministerial duty capable of direct enforcement. (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.) Because the operative complaint does not identify such a duty, the second cause of action was subject to dismissal. The trial court, therefore, did not commit reversible error in sustaining the demurrers to this claim. (See *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111 (*Fremont*) [an appellate court must affirm an order sustaining a demurer "if any of the grounds stated in the demurrer is well taken"].)

3. *Mental Health Parity Laws*

Fairchild's third cause of action, asserted against both the County and the Department, sought a writ of mandate compelling compliance with the Mental Health

29

Parity and Addiction Equity Act of 2008, 42 U.S.C. section 300gg-26 (MHPAEA), and its implementing regulations. "MHPAEA is an amendment to [the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461]. [Citation.] Congress enacted the statute 'to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans.' " (*E.W. v. Health Net Life Insurance Co.* (2023) 86 F.4th 1265, 1280; *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.* (2d Cir. 2016) 821 F.3d 352, 356.) "MHPAEA imposes coverage requirements on 'a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits.' [Citation.] [Among other things], covered plans must ensure that: (1) 'treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage)'; and (2) 'there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.' " (*E.W.*, at p. 1281.)

We find no basis for reversal. A review of the operative complaint reveals that Fairchild's MHPAEA claim is predicated on the County's "delay and denial of *meaningful access* to SMHS [for 5150] patients" (italics added), which is "unequal to the manner and limitations on the provision of physical medical services under Medi-Cal." According to the operative complaint, mandamus relief was proper because the County and the Department failed to "ensure parity between the mental health care services and physical health care services that are provided through the Medi-Cal program," which resulted in Fairchild not receiving "reimbursement for providing SMHS within its capabilities." The operative complaint further alleged that, due to such inaction, Fairchild was forced to "divert staff and resources while waiting for the patients to be

transferred or discharged" and to "incur costs related to keeping these patients in [its] emergency department."

We need not decide whether the trial court erred in determining that this claim failed as a matter of law because there is no private right of action to enforce the mental health parity provisions of the Medicaid Act. As the County and the Department argued in the trial court, the operative complaint does not state an actionable claim for mandamus relief. Like its other writ claims, Fairchild failed to identify any specific statutory language imposing a mandatory and ministerial duty in explicit and forceful language. And nothing in the operative complaint establishes the existence of such a duty--that is, an obligation on the part of the County or the Department to perform a specific, nondiscretionary act in a certain way upon learning of the facts alleged in the operative complaint. In short, because (as we have noted) a traditional writ of mandate will only lie where there is a ministerial duty capable of direct enforcement (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236), Fairchild's third cause of action was subject to dismissal. Accordingly, the trial court did not commit reversible error in sustaining the demurrers to this claim. (See *Fremont, supra,* 148 Cal.App.4th at p. 111 [an appellate court must affirm an order sustaining a demurer "if any of the grounds stated in the demurrer is well taken"].)

4. *Section 17000*

Fairchild's fourth cause of action, which is only asserted against the County, sought a writ of mandate compelling compliance with section 17000. In support of this claim, Fairchild alleged that the County violated the statute by failing to provide "meaningful access" to medically necessary SMHS and "post-stabilization services" to indigent patients "who present to Fairchild with emergency medical conditions." Fairchild further alleged that the County violated the statute by failing to reimburse it for costs incurred for services rendered to indigent patients who present to Fairchild with emergency mental health conditions.

31

Section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Section 17000 creates a relief program for indigents who cannot qualify for other forms of specialized aid. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991.) "Counties have 'broad discretion to determine eligibility for—and the types of—indigent relief' but 'this discretion must be exercised in a manner that is consistent with—and that furthers the objectives of—state statutes. [Citations.] These objectives are "to provide for protection, care, and assistance to the people of the state in need thereof, . . . to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed," and to administer such aid and services "promptly and humanely." ' " (*McCormick v. County of Alameda* (2011) 193 Cal.App.4th 201, 211; see § 10000 [identifying objectives].)

Courts have construed section 17000 as requiring counties to provide indigent residents with emergency and medically necessary care. (*Fuchino v. Edwards-Buckley* (2011) 196 Cal.App.4th 1128, 1135; see *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 104-105 [collecting cases]; see also *Alford v. County of San Diego* (2007) 151 Cal.App.4th 16, 28.) This "obligation neither requires the County to satisfy all unmet needs, nor mandates universal health care. . . . The Legislature has eliminated any requirement that counties provide the same quality of health care to residents who cannot afford to pay as that available to nonindigent individuals receiving health care services in private facilities. [Citation.] Section 10000 imposes a minimum standard of care -- one requiring that subsistence medical services be provided promptly and humanely. [Citation.] Counties retain discretion to determine how to meet this standard, but they may not deny subsistence medical care to residents based upon criteria unrelated to individual residents' financial ability to pay all or part of the actual cost of such care."

32

(*Hunt v. Superior Court, supra*, 21 Cal.4th at pp. 1014-1015.) Counties must also relieve indigent persons of the cost of such care. (*Fuchino,* at p. 1136; see also *Hunt,* at pp. 1013-1014.)

Fairchild argues reversal is required because it sufficiently stated a violation of section 17000, since the operative complaint alleged that the County provides "*no medically necessary services*" to indigent 5150 patients. (Italics added.) Initially, we observe that the operative complaint does not allege as much. Rather, it alleges that indigent 5150 patients presenting to Fairchild's emergency department are provided emergency medical care for physical emergency conditions but are not provided "*meaningful access*" to medically necessary psychiatric and mental health care services (i.e., SMHS). The operative complaint further alleged that the County "refused and failed to reimburse Fairchild for costs incurred for services rendered to indigent patients who present to Fairchild with emergency mental health conditions." Thus, the question for us is whether the County's purported failure to provide "meaningful access" to medically necessary psychiatric and mental health care services to indigent 5150 patients is sufficient to state a claim for a writ of mandate to compel compliance with section 17000. Further, we must decide whether Fairchild's allegation that the County failed to reimburse it for costs incurred for services rendered to indigent patients who present to Fairchild with emergency medical conditions is sufficient to state a claim for a writ of mandate to compel compliance with section 17000.

As an initial matter, we deem Fairchild's undeveloped claim of error forfeited. Fairchild again fails to cite authority or provide reasoned legal analysis explaining how and why the trial court committed reversible error in determining that Fairchild had failed to state a viable cause of action. (*United Grand, supra,* 36 Cal.App.5th at p. 153.) But even were we to consider the merits of Fairchild's claim, we would reject it. The trial court properly determined that the operative complaint failed to state an actionable claim for mandamus relief. Fairchild did not identify any clear legal mandate requiring the

County to affirmatively provide indigent 5150 patients with medically necessary psychiatric and mental health care services (i.e., SMHS) while these patients are being held at Fairchild pursuant to the LPS Act. Indeed, nothing in section 17000 imposes such a mandatory and ministerial duty on the County in explicit and forceful language. And the operative complaint is devoid of any allegations establishing the existence of such a duty that could be remedied by the issuance of a writ of mandate. Further, the operative complaint does not include sufficient allegations to support an actionable claim for mandamus relief predicated on the County's purported failure to reimburse Fairchild for costs incurred for services rendered to indigent patients who present to Fairchild with emergency medical conditions that require SMHS and medically necessary poststabilization services. The operative complaint only cites section 17000, and nothing in that provision imposes a clear legal mandate to provide such reimbursement. As we have repeatedly observed, a traditional writ of mandate will only lie where there is a ministerial duty capable of direct enforcement. (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.) Accordingly, because the operative complaint does not identify such a duty, the trial court properly sustained the County's demurrer to the fourth cause of action.

5. *LPS Act*

Fairchild's fifth cause of action, which is only asserted against the County, sought a writ of mandate compelling compliance with the LPS Act. In support of this claim, the operative complaint alleged: "Fairchild is not a county-designated and DHCS-approved facility under the LPS Act. Nevertheless, the County or its designees transports or causes to be transported individuals on 5150 holds in the custody of the County to Fairchild, where they are held and secluded without the County arranging or providing any services to address the underlying mental health condition. The County sometimes authorizes additional 72-hour holds on these 5150 patients but does not provide or arrange for mental health care services." The operative complaint further alleged (without additional

34

elaboration or explanation) that "the County's actions and inactions violate California Welfare and Institutions Code sections 5150 et seq." According to Fairchild, "[a]s a direct consequence of the County's actions and inactions, the 5150 patients are forced to be secluded in Fairchild's emergency department for lengthy periods of time without any SMHS and other necessary related care to address their psychiatric and mental health conditions."

Fairchild argues reversal is required because it sufficiently alleged the County violated the LPS Act by "secluding" 5150 patients in Fairchild's emergency department after the patients have been medically cleared and stabilized, without providing them with the medically necessary treatment the LPS Act requires (i.e., SMHS), but which Fairchild is not equipped to provide. Fairchild initially claims the trial court erred in determining that Fairchild is a "facility eligible to serve as an LPS facility." According to Fairchild, because it is "neither county-designated nor approved by the Department," it "cannot be used, outside the scope of its EMTALA obligations, as an LPS facility to detain, evaluate, and treat the County's 5150 [patients]." We disagree. As we next explain, the trial court correctly concluded that Fairchild is a proper facility for an authorized individual to take a person subject to a 5150 hold.

Under the version of the LPS Act applicable at the time of the challenged ruling, a " '[d]esignated facility' or 'facility designated by the county for evaluation and treatment' mean[t] a facility that [was] licensed or certified as a mental health treatment facility *or* a *hospital*, as defined in subdivision (a) or (b) of Section 1250 of the Health and Safety Code, by the State Department of Public Health, and [could] include, but [was] not limited to, a licensed psychiatric hospital, a licensed psychiatric health facility, and a certified crisis stabilization unit." (Former § 5008, subd. (n).) For purposes of the LPS Act, a "hospital" included a "general acute care hospital." (Health & Saf. Code, § 1250, subd. (a).) Here, it is undisputed that Fairchild is a general acute care hospital. Accordingly, under a straightforward reading of the statutory text, Fairchild was a

designated facility within the meaning of the LPS Act. Fairchild, for its part, has not directed us to any language in the Act that required a county to affirmatively "designate" a general acute care hospital to "serve as an LPS facility" before persons could be brought and held there pursuant to section 5150.**15** Nor has Fairchild cited any case law holding that the Act prohibits an authorized individual from taking a person subject to a 5150 hold to a "general acute care hospital," unless that hospital was "county-designated" *and* "approved" by the DHCS.**16**

---

**15** As Fairchild points out in its reply brief, the Legislature recently amended the LPS Act, including section 5008. (Stats. 2024, ch. 644, § 5.) Effective January 1, 2025, the amended version of section 5008 reads, in relevant part, as follows: " 'Designated facility,' 'facility designated by the county for evaluation and treatment,' or 'facility designated by the county to provide intensive treatment' means a facility that meets designation requirements duly established by the [DHCS] in accordance with Section 5404, including, but not limited to, the following: [¶] (A) Psychiatric health facilities licensed by the State Department of Health Care Services. [¶] (B) Psychiatric residential treatment facilities licensed by the State Department of Health Care Services. [¶] (C) Mental health rehabilitation centers licensed by the State Department of Health Care Services. [¶] . . .[¶] (E) *General acute care hospitals* licensed by the State Department of Public Health." (Stats. 2024, ch. 644, § 5, italics added; see *People v. Henderson* (1980) 107 Cal.App.3d 475, 488 ["Under the California Constitution, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment except where the statute is passed as an urgency measure and becomes effective sooner"].)

We are unpersuaded by Fairchild's contention that the current or amended version of section 5008 is properly interpreted to mean that an acute care hospital is *eligible* to serve as a designated facility but does not qualify as such a facility until it is "affirmatively designated by a county" and the hospital agrees to accept that designation. As discussed *post*, section 5404 does not include a specific designation requirement in order for a general acute care hospital to qualify as a designated facility within the meaning of the LPS Act. (See § 5404, subd. (a).)

**16** Citing *City of San Diego v. Kevin B*. (2004) 118 Cal.App.4th 933, Fairchild argues the County only has the authority to take a person detained under the LPS Act to a facility designated by the county for evaluation and treatment and approved by DHCS. While there is language in *Kevin B*. that appears to suggest as much (see *Kevin B*., at p. 936), the

36

As for DHCS approval, we do not read the LPS Act as imposing such a requirement. Section 5150 permits a person subject to the statute (i.e., a 5150 patient) to be taken into custody "for a period of up to 72 hours for assessment, evaluation, and crisis intervention, *or* placement for evaluation and treatment in a facility designated by the county for evaluation and treatment *and* approved by the [DHCS]." (§ 5150, subd. (a), italics added.) In our view, the language a "facility designated by the county for evaluation and treatment and approved by the [DHCS]" identifies a limitation as to the type of facility where a 5150 patient may be placed "for evaluation and treatment." (*Ibid*; see former § 5404, subd. (a) ["Each county may designate facilities, *which are not hospitals* or clinics, as 72-hour evaluation and treatment facilities and as 14-day intensive treatment facilities if the facilities meet those requirements as the Director of Health Care Services may establish by regulation. The Director of Health Care Services shall encourage the use by counties of appropriate facilities, which are not hospitals or clinics, for the evaluation and treatment of patients pursuant to this part."];[17] Cal. Code Regs. tit.

language is dicta, as it was unnecessary to the decision, since Kevin B. was never taken into custody under section 5150. (*Kevin B*., at pp. 936-937.) "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620; see *Serrano v. Aerotek, Inc*. (2018) 21 Cal.App.5th 773, 784 [concluding a decision of another appellate court was "not authority for the proposition" a party cited it for, as that portion of the decision was "undoubtedly dictum," because it was a statement of a principle that was not necessary to the decision], disapproved on another point of law in *Donohue v. AMN Services, LLC* (2021) 11 Cal. 5th 58, 77.)

[17] We recognize that the Legislature recently amended section 5404. Effective January 1, 2025, section 5404, subdivision (a) is amended to read: "*Counties may designate facilities to provide evaluation and treatment in accordance with Article 1 (commencing with Section 5150) of Chapter 2 of this part*, and intensive treatment in accordance with Articles 4 through 4.7, inclusive, and Article 6 (commencing with Section 5300) of Chapter 2 of this part. Designated facilities shall meet those designation requirements duly established by the [DHCS]. *Subject to requirements duly established by the [DHCS], counties may designate appropriate facilities, that are **not hospitals** or clinics*." (Stats. 2024, ch. 644, § 7, emphasis added.) The Legislature also added

37

9, § 821 ["Any facility designated by the board of supervisors of a county for *evaluation and treatment* pursuant to . . . the Welfare and Institutions Code, is subject to approval of the Department"].)  We construe the statute to mean that a 5150 patient cannot be placed in a facility for *evaluation and treatment* unless that facility is a licensed or certified *psychiatric or mental health treatment facility* that has been designated by the county for evaluation and treatment and approved by the DHCS.  (See former § 5008, subd. (n) [defining "facility designated by the county for evaluation and treatment" to mean a facility that is "licensed or certified as a mental health treatment facility"];[18] 5150, subd. (i)(1) [indicating that "a facility designated by the county for evaluation and treatment" means a psychiatric facility]; § 5152, subd. (a) [a person admitted to a facility for 72-hour treatment and evaluation shall receive evaluation and whatever treatment and care the person's condition requires by a psychiatrist or both a psychiatrist and psychologist].)

Our construction of the statute comports with a longstanding rule of statutory construction known as the " ' "last antecedent rule," '--provides that "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743; *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.)  Additional support for our interpretations is provided by the punctuation of the statute.  "Evidence that a qualifying phrase is supposed to apply to all

---

subdivision (b) to section 5404, which states:  "The [DHCS] shall approve county designation of facilities to provide the types of treatment described in subdivision (a)" (e.g., evaluation and treatment in accordance with section 5150).  (Stats. 2024, ch. 644, § 7.)  None of the amendments to section 5404 persuades us to adopt Fairchild's construction of the LPS Act.

[18]  We note that, effective January 1, 2025, section 5008 included a new provision, which reads, in pertinent part:  "A county may designate a facility for the purpose of providing one or more of the following services:  [¶]  (i) Providing evaluation and treatment pursuant to Article 1 (commencing with Section 5150) of Chapter 2."  (§ 5008, subd. (n)(2)(A); Stats. 2024, ch. 644, § 5.)

antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." (*White*, at p. 680.) Here, the phrase "in a facility designated by the county for evaluation and treatment *and* approved by the [DHCS]" (§5150, subd. (a)), "is *not* set off from the preceding phrase by a comma. Instead, the entire phrase "placement for evaluation and treatment in a facility designated by the county for evaluation and treatment *and* approved by the [DHCS]," is set off from the preceding phrase--"assessment, evaluation, and crisis intervention"--by a comma followed by the word "or." (*Ibid.*) As our Supreme Court has explained, "Such use of the word 'or' in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories." (*White*, at p. 680.)

We reject Fairchild's remaining contention that reversal is required because the operative complaint alleged that "the County provides *no mental health services* by qualified health care professionals that its 5150 detainees need." In making this argument, Fairchild claims the County violated section 5152. This provision, which is not cited in the operative complaint, states, in relevant part: "A person *admitted to a facility for 72-hour treatment and evaluation* under the provisions of this article shall receive an evaluation as soon as possible after the person is admitted and shall receive whatever treatment and care the person's condition requires for the full period that they are held." (§ 5152, subd. (a), italics added.) Here, because Fairchild is a general acute care hospital, not a psychiatric facility where 5150 patients may be *admitted for 72-hour treatment and evaluation*, section 5152 does not apply. And Fairchild has failed to identify (in the operative complaint or in its appellate briefing) any clear legal mandate in the LPS Act that the County has violated. Fairchild has not pinpointed any specific statutory language imposing a mandatory and ministerial duty on the County in explicit and forceful language. That is, language requiring the County to affirmatively perform a specific, nondiscretionary act in a particular way upon learning of the facts alleged in the operative complaint. Again, a traditional writ of mandate will only lie where there is a

ministerial duty capable of direct enforcement. (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.) Accordingly, because the operative complaint does not identify such a duty, the trial court properly sustained the County's demurrer to the fifth cause of action.

### 6. *Breach of Contract*

Fairchild's sixth cause of action, which is only asserted against the County, alleges breach of an implied-in-fact contract. In support of this claim, Fairchild alleged that it provides the County written notice whenever a 5150 patient (including indigent and Medi-Cal beneficiaries) is stabilized and capable of being safely transferred to another facility. Fairchild's written notice also informs the County that the 5150 patient needs SMHS immediately or promptly, that the patient requires continued poststabilization services to maintain his or her stabilized condition, and that the patient will continue to receive poststabilization services at Fairchild. As part of its written notice, Fairchild requests that the County transfer the 5150 patient to an appropriate facility to receive SMHS. As an alternative, Fairchild offers to continue to render the required poststabilization services for the 5150 patient but at Fairchild's standard "full billed charges." According to the operative complaint, because the County took "no steps to transport any of the 5150 patients to another appropriate facility" and instead "knowingly authorized, permitted, and instructed Fairchild to continue to render post-stabilization services for the 5150 patients at Fairchild's standard full billed charges," an implied-in-fact contract was created.

Fairchild argues the trial court erroneously concluded that an implied-in-fact contract "cannot lie" against the County because "a county is not liable to pay any claim for services rendered except those whose payment is authorized by law." According to Fairchild, reversal is required because the operative complaint sufficiently stated a claim for breach of an implied-in-fact contract, and because there is no statutory or regulatory prohibition against the creation of such a contract under the circumstances presented.

40

However, aside from citing a handful of cases for general legal principles--namely, that a public agency *may* be bound by an implied contract or found liable on the basis of an implied-in-fact contract--Fairchild offers no reasoned legal analysis establishing the existence of a viable cause of action for breach of an implied-in fact contract. Indeed, Fairchild fails to explain how and why the parties' conduct created a valid implied-in-fact contract, such that it was error for the trial court to dismiss this claim. In the absence of cogent argument applying the asserted legal principles to the relevant facts, we may and do disregard the claim of error. (*United Grand, supra,* 36 Cal.App.5th at p. 153; see *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078 ["Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review"].) But even were we to consider the merits of Fairchild's claim, we would reject it.

A contract may be written, oral or inferred from the parties' conduct as an "implied-in-fact" contract. (*Westside Estate Agency, Inc. v. Randall* (2016) 6 Cal.App.5th 317, 328; see Civil Code, § 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct"].) An implied contract must be founded upon an ascertained agreement of the parties to perform it. (*Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1507 [the "very heart" of an implied-in-fact agreement is "an *intent* to promise"].) Accordingly, an implied-in-fact contract " 'consists of obligations arising from *a mutual agreement and intent to promise* where the agreement and promise have not been expressed in words.' " (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178, italics added; see *Aton Center, Inc. v. United Healthcare Insurance Co.* (2023) 93 Cal.App.5th 1214, 1230 [a claim for breach of an implied contract has the same elements as a claim for breach of a written contract, except that the promise is not expressed in words but is implied from conduct].)

41

"As with any contract claim, a key element [of an implied-in-fact contract] is the mutual assent of the parties to the contract. ' "[T]he vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration. As to the basic elements, there is no difference between an express and implied contract." ' " (*Berlanga v. University of San Francisco* (2024) 100 Cal.App.5th 75, 82 [an implied-in-fact contract require a meeting of minds or an agreement].) Thus, an implied-in-fact contract (like a written contract) is founded upon an ascertained agreement or, in other words, is consensual in nature. (*Ibid.*) " ' "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." ' " (*Aton Center, Inc. v. United Healthcare Insurance Co.*, supra, 93 Cal.App.5th at p. 1231.)

We recognize that a " 'county may be bound by an implied contract under California law if there is no legislative prohibition against such arrangements, such as a statute or ordinance.' " (*San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, 439.) However, we need not decide whether the trial court erred in determining that Fairchild's breach of contract claim failed as a matter of law because such a claim "cannot lie" against the County as a matter of law, as the operative complaint fails to state facts sufficient to state an actionable cause of action. As pointed out by the County in its demurrer, Fairchild did not allege that the County agreed or promised to pay for "post-stabilization services" at Fairchild's "standard full billed charges." And the operative complaint concedes that the County has never paid for those services in response to Fairchild's demands. In short, because there are no allegations of conduct manifesting mutual consent to enter into an implied contract (i.e., a meeting of the minds between the parties as to the essential terms), Fairchild's breach of contract claim was subject to dismissal. Accordingly, the trial court properly sustained the County's demurrer to Fairchild's sixth cause of action. (See *Fremont*, *supra*,

42

148 Cal.App.4th at p. 111 [an appellate court must affirm an order sustaining a demurrer "if any of the grounds stated in the demurrer is well taken"].)

### 7. *Declaratory Relief*

Given our determination that the operative complaint fails to state a viable cause of action, we find no error in the trial court's ruling that Fairchild failed to state a claim for declaratory relief. A trial court may, as here, dismiss a declaratory relief claim at the demurrer stage where it is " ' "wholly derivative" ' " of other failed claims. (*Smyth v. Berman* (2019) 31 Cal.App.5th 183, 191-192.)

### 8. *Leave to Amend*

" 'If we see a reasonable possibility that the plaintiff could cure the defect by amendment, then we conclude that the trial court abused its discretion in denying leave to amend. If we determine otherwise, then we conclude it did not.' [Citation.] ' "The burden of proving such reasonable possibility is squarely on the plaintiff." ' [Citation.] To satisfy this burden, ' "a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading' " ' by clearly stating not only the legal basis for the amendment, but also the factual allegations to sufficiently state a cause of action." (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 618.)

No abuse of discretion appears. In the trial court, Fairchild did not suggest any specific amendments to cure the defects of the operative complaint. In its opening brief on appeal, Fairchild simply asserts that it could "provide amendments" to cure "some of the defects that the superior court identified." This conclusory assertion is insufficient to satisfy Fairchild's burden to show "in what manner" it could amend the operative complaint and how the proposed amendment(s) would change the "legal effect" of the pleading. (*Graham v. Bank of America, N.A.*, *supra*, 226 Cal.App.4th at pp. 618-619 [the assertion of an abstract right to amend does not satisfy burden to show how complaint can be amended to cure defects].)

Equally unavailing are the arguments for reversal Fairchild makes for the first time in its reply brief. In support of its position, Fairchild only offers, in general terms, the *type* of allegations it could add to the operative complaint to cure the defects. And Fairchild fails to offer cogent legal analysis clearly explaining how its proposed amendments would change the legal effect of the operative complaint. For example, Fairchild asserts: "[T]o the extent any claim [was] dismissed because it challenge[d] the County's or [the Department's] exercise of discretion under the Medi-Cal laws, Welfare & Institutions Code section 17000, or the LPS Act, Fairchild could amend to provide more facts to confirm that Respondents abused any discretion they had. Fairchild could add allegations concerning the County's and [the Department's] knowledge about and disregard of 5150 detainees' clinical conditions, including the urgency of psychiatric medical emergencies, and the inadequate services to address those conditions that are provided by the County in the [emergency department]." We find Fairchild's showing inadequate to establish reversible error. Nothing in Fairchild's reply brief shows that it is reasonably probable Fairchild could cure the defects of the operative complaint by amendment.

II

*Preliminary Injunction*

As we next explain, we conclude Fairchild's appeal from the denial of its motion for a preliminary injunction is subject to dismissal.

"A preliminary injunction is an interim remedy designed to maintain the status quo pending a decision on the merits. [Citation.] It is not, in itself, a cause of action." (*MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623.) Thus, where (as here) a trial court properly sustains a demurrer without leave to amend to the causes of action which might have supported a preliminary injunction, the appeal from the denial of a motion for preliminary injunction is moot. (*Ibid.*; see also *Agnew v. Los Angeles* (1958) 51 Cal.2d 1, 2; *Korean American Legal Advocacy Foundation v. City of Los*

44

*Angeles* (1994) 23 Cal.App.4th 376, 399.) Here, because we have concluded that the trial court properly sustained the demurrers to the operative complaint without leave to amend, we need not and do not consider the merits of Fairchild's appeal from the denial of its motion for a preliminary injunction. That appeal will be dismissed as moot. (*Agnew,* at p. 2.)

## DISPOSITION

The judgment of dismissal entered against Fairchild after the trial court sustained the demurrers to the operative complaint without leave to amend is affirmed, and Fairchild's appeal from the denial of its motion for a preliminary injunction is dismissed as moot. The County and the Department shall recover their costs on appeal. (Rule 8.278(a).)


                                                          /s/
                                        Duarte, Acting P. J.


We concur:




     /s/
Krause, J.




     /s/
Wiseman, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.